---

(No. 13307.—Judgment affirmed.)
THE AMERICAN UNIVERSITY, Appellant, *vs.* D. E. WOOD *et al.* Appellees.

*Opinion filed June 16, 1920—Rehearing denied October 8, 1920.*

1. EQUITY—*general rule as to application of maxim that com-plainant must have clean hands.* The maxim that he who comes into a court of equity must come with clean hands does not bar everyone guilty of wrongful conduct from relief in a court of equity, but as a general rule it is required that the wrongdoing or fraud of the complainant must be connected with the subject of the litigation and have some relation to the rights of the parties arising out of the transaction.

2. SAME—*a court of equity will not protect complainant in de-frauding the public.* A court of equity will not take cognizance of a bill to enjoin an interference with the complainant's business, which is maintained by misrepresentations amounting to a fraud upon the public, as said court will not exercise its extraordinary powers to aid a litigant in perpetrating a fraud upon the public.

APPEAL from the Second Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

HARRIS F. WILLIAMS, (E. M. VOTAW, of counsel,) for appellant.

FREDERICK MAINS, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

This litigation was begun by bill in equity filed June 13, 1917, in the circuit court of Cook county by the American University against D. E. Wood and the Chicago University of American Sciences, a corporation. The bill alleged complainant is a corporation organized under the laws of Illinois for pecuniary profit in July, 1911, and authorized, among other things, to establish and conduct a college or school of learning for the purpose of giving instruction, in person or by correspondence, in chiropractic and to publish and sell publications pertaining thereto; that its business has been carried on largely by correspondence with students in different parts of the United States, averaging in number 2500 or 3000 during the three or four years preceding the filing of the bill, and that $20,000 has been expended in building up its business. The bill charged the defendants with circulating letters and advertising matter among the students and prospective students of complainant containing statements and charges of a character derogatory to complainant and its business, and prayed they be enjoined from further sending out such circulars and letters. Answers to the bill were filed by the defendants, and the cause was referred to a master in chancery to take and report the testimony together with his conclusions of law and fact. The master reported recommending a decree as prayed in complainant's bill, and the chancellor, after

overruling exceptions by defendants, entered a decree enjoining them as prayed in the bill. Defendants prosecuted an appeal to the Appellate Court for the First District, where the decree was reversed and the cause remanded; with directions to dismiss the bill. The Appellate Court granted a certificate of importance, and complainant has prosecuted an appeal to this court.

Complainant received its certificate of organization as a corporation from the Secretary of State in July, 1911, under the name American University of Mental Science. The purpose for which it was incorporated, as shown by its application, was to conduct "an academy, institute, college or school of learning for the purpose of giving instructions, in person or by correspondence, in the various branches of psychic science, psychology, mental science, psycho-theraphy, suggestion, suggestive therapeutics, philosophy, metaphysics, occultism and kindred philosophies and sciences," and to publish and sell books, literature and articles of merchandise pertaining to said subjects and sciences. Its capital stock was $2500, divided into shares of $50 each, par value. Its certificate of incorporation was never recorded. It caused an amendment to its charter to be made in 1913, changing its name to American University, and also including in the objects for which it was formed, teaching, among other things, chiropractic. Defendant Wood was a chiropractic practitioner and became connected with complainant as instructor in that subject in 1913. He also during his connection with complainant became the owner of twelve shares of stock. Substantially all the rest of the stock was owned by F. S. Tinthoff and S. J. Tinthoff. After the change in name and object of the corporation its business appears to have been substantially confined to teaching chiropractic by correspondence through the mails, for which it charged each of its students $68.75, payable in installments. The master found from the proof that complainant had assets in value ap-

proximately of $110,000, and that for seven months subsequent to January 1, 1917, its average profits were $800 per month. Wood was elected president of complainant, F. S. Tinthoff secretary and S. J. Tinthoff treasurer. Wood was discharged from his position with the corporation as instructor December 22, 1916. He had possession of the lists of students and prospective students, which were demanded of him but he refused to deliver them up, and early in January, 1917, he began addressing communications to complainant's students and prospective students belittling the course of study and methods of instruction furnished by complainant; informing them he was establishing a new and better course of teaching chiropractic by mail, and suggesting, at least by inference, that they cease their connections with complainant and become students of the new school to be established. Some, at least, of these communications were signed by him as former president of the American University. Subsequently the officers of complainant and Wood met and entered into a settlement agreement. Complainant held Wood's note for something over $5000 for money advanced him. In the settlement Wood turned over his stock and complainant gave him his note and $1000 in cash, in consideration of which Wood agreed to deliver to complainant the lists of students and the documents in his possession belonging to complainant within forty-eight hours, and further agreed he would not address and send to students and customers of complainant any more letters or documents of the kind complained of, and would not in any way interfere with complainant's business. The agreement was signed by complainant by its officers and William L. LeBoy, successor to Wood with complainant, as parties of the first part, and D. E. Wood, party of the second part. Wood did not keep his agreement to deliver to complainant its lists of students and prospective students and continued to send communications to them. On January 15, 1917, defendant the Chicago

University of American Sciences was incorporated, with
D. E. Wood faculty head, after which numerous commu-
nications were sent by him to complainant's students, some
of them addressed "to my old students," advising them of
the superior facilities of the Chicago University of Ameri-
can Sciences for teaching chiropractic, the plain purpose of
which was to secure them as students for the new Chicago
University. In some of the communications students were
advised to pay no more on their contract of enrollment with
complainant; that complainant had violated its contract
with them by depriving them of his (Wood's) services
throughout their course. He spoke of the stockholders of
complainant as "money-grabbing stockholders," and offered
to give the students a better course of instruction for less
money if they would come with him. Numerous commu-
nications were sent out to complainant's students by Wood
addressed "Dear Student," belittling complainant and its
instructor in chiropractic and advising them of the advan-
tages of becoming a student of Wood because of his abili-
ties, and promising to give them good service and satis-
faction or their instruction would not cost them anything.
The communications were numerous, some of them lengthy,
and the foregoing is but a brief outline of a few of them.
It is not disputed that Wood sent them, and the purpose
is, of course, evident.

Two principal questions are raised on this record. It
was contended in the Appellate Court, and is here, that the
bill cannot be maintained (1) because complainant having
failed to file its certificate of incorporation as required by
statute, it is no longer a corporation and is not entitled to
maintain the suit; (2) that it did not come into a court of
equity with clean hands, because the proof showed it was
conducting its business and enterprise in a fraudulent man-
ner. It was on the last named ground that the Appellate
Court based its judgment reversing the decree and direct-
ing the dismissal of the bill.

Appellant contends that teaching chiropractic by correspondence is a lawful business which it was authorized to engage in; that the doctrine of clean hands is applicable only to the transaction immediately involved, and there is nothing in this case to show any fraud or unfair dealing on its part with defendants, and whether it has been guilty of fraudulent practices with others is no concern of defendants and they cannot be heard to make that defense.

The defense of unclean hands was expressly relied on in the answers and evidence was offered to support it. In complainant's advertising matter representing the popularity of chiropractic it was stated it could be quickly mastered and a fair average income to one who practiced it with ordinary intelligence ought to be from $3000 to $6000 per year, and that complainant would help its students to get quickly established; that the university desired to confer the degree of D. C. on a large number of graduates; that anyone who could read and understand plainly written English would have no difficulty in mastering the course; that students receive individual and personal instruction from "the various members of our university faculty" throughout the course; that its graduates were forging steadily ahead, some of them with incomes from $5000 to $10,000 a year; that one "of our graduates" reported a cash income from August, 1912, to August, 1913, of $11,077.50. Complainant's catalogue for the year 1916-17 contained a picture of Dr. LeBoy, president. Under the heading "Faculty," it contained the pictures of five men with numerous degrees following their names, and under the heading "Consulting Staff" were the pictures of fifteen men, each with one or more degrees. The catalogue represented the faculty as being composed of men each of whom was a recognized specialist in his line and a practitioner and teacher of wide reputation, superior to that of any other institution. The president, Dr. LeBoy, was represented as a renowned author, teacher and lecturer on the

science and art of chiropractic and the greatest exponent of drugless healing. It was further represented that the officers of the university, in selecting the faculty for "its department of chiropractic," had been governed by the importance of the science of teaching, and had required that every member of it should be one standing high in the ranks of those possessing a knowledge of the science of chiropractic as well as having had long and wide experience in its practice. Scientific methods of instruction under supervision of skilled instructors were promised. Age and previous occupation were no barrier to mastering chiropractic if one could read and understand plainly written English. The catalogue especially recommended "our university extension course (home study) in chiropractic," which had been especially prepared for those who desired to take the course without the expenditure of large sums of money for tuition, railroad fare and board. For that course the lessons were systematically arranged according to a scientific plan and were the work of many able minds, the combined intelligence and experience of many professionally trained men, "and is not a one-man course." It states that the lesson papers of students were given attention by a "competent personal instructor," and that the "American University, department of chiropractic," confers upon its graduates in the extension or home-study course the degree of "Doctor of Chiropractic free." The average time for completion of the course by one having "an ordinary school education" was represented to be about eight months. Some of the advertising matter sent out by complainant before Dr. Wood's connection with it ceased was prepared by him and he saw advertising prepared by others. The character of complainant's advertising does not appear to have changed with Wood's retirement from complainant's service. The matter referred to in the catalogue, as we understand the testimony, was substantially the same before Wood left complainant as afterwards. The proof showed the univer-

sity occupied a suite on the third floor of a building at 81 West Randolph street, Chicago, and it had no students in its "department of chiropractic" except those taking its university extension or home-study course.  Its business management was under the supervision of F. S. and S. J. Tinthoff, brothers, one of whom was secretary and the other treasurer.  They owned most of the stock.  The faculty of the department of chiropractic consisted of Wood until his discharge, in December, 1916, and after that of LeBoy, who succeeded Wood as president of the university.  The Tinthoffs were not professional men and were not familiar with the subject complainant was teaching.  LeBoy was a graduate in medicine and had practiced his profession about twelve years.  He received a diploma in chiropractic from Wood in 1914 without having taken the course in that subject, and, as Wood testified, without an examination.  LeBoy testified he had practiced *his* profession,—medicine,— but not *this* profession,—chiropractic, as stated in the catalogue,—about twelve years, and that during his practice he had read some books on chiropractic and had sometimes used that method of treatment with patients.  The American University had no consulting staff.  In some of its advertising it stated what the income of some of its graduates was.  One of "our graduates" was said to have made in cash in one year from August, 1912, to August, 1913, $11,077.50, while the proof shows it had no graduates then and that it had no knowledge of the income of any of its graduates.  There can be no doubt the advertising sent out was well calculated to make the impression that the American University was an educational institution with various departments, one of which was the department of chiropractic.  The impression the skillful wording of the catalogue would make on the mind of one reading it would also be that the university extension or home-study course of that department was for the benefit of those who had not the means or did not wish to incur the expense of at-

294   13

tending the university to receive personal instruction, but that such instruction was given to those who desired it. The fact is, complainant gave instructions in no other way than by correspondence.

There are many other things which might be referred to to show that complainant was practicing fraud and deception in the conduct of its business, but, as we have said, it insists that its business of teaching chiropratic by correspondence is lawful; that its methods of conducting and managing its business are immaterial so far as defendants are concerned and should not be considered as a bar to relief from the malicious and unlawful acts of defendants, committed for the purpose of destroying complainant's business; also that "puffing" and "exaggerations" in its advertising do not constitute fraud or unclean hands. There can be no dispute that defendants were conducting a campaign against complainant for the purpose of destroying or injuring its business. The Chicago University was incorporated almost immediately after Wood's discharge by complainant for the purpose of teaching chiropractic by correspondence. Wood was made its chancellor, and complainant's lists of patrons were used by him and his university in the very vigorous and malicious campaign conducted to injure complainant and themselves profit by complainant's destruction. Nothing in the attitude and conduct of defendants toward complainant commends them to the consideration of a court of equity, and their advertising methods were no less objectionable and misleading than those of complainant. In fact, Dr. Wood, whose picture was on some of the Chicago University publications, and, following his name, LL.B., D.M.T., Opt. D., D.O., M.D., D.C., was as much responsible for the character of complainant's advertising and the method of conducting its business while he was its president as anyone else and has carried similar methods into the conduct of defendants'

business.   The maxim that he who comes into a court of equity must come with clean hands was never intended to bar everyone guilty of wrongful conduct from relief in a court of equity, and as a general rule it is required that the wrongdoing or fraud of the complainant, to bar him from relief on the ground that he comes with unclean hands, must be connected with the subject of the litigation and have some relation to the rights of the parties arising out of the transaction.   That rule is not applicable to the facts .in this record.   It is true, the fraud and wrongdoing of complainant did not affect the private rights of defendants and afforded no justification in morals for their seeking to profit by exposing them, but on the ground of the public interest and policy we do not think complainant's grievance is of a character to be redressed in a court of equity.   The misrepresentations of complainant in the conduct of its business affected the public, and it would seem a strange thing if a court of conscience should be required to protect a suitor in the commission of a fraud upon the public.   A court of equity is a court of conscience and will exercise its extraordinary powers only to enforce the requirements of conscience.   It is no part of its function to aid a litigant in the promotion of a fraud upon the public.   These views find support in *Primeau* v. *Granfield,* 114 C. C. A. 549, writ of *certiorari* denied 225 U. S. 708; 4 A. L. R. 92, div. 6 of note; 16 Cyc. 148; *Manhattan Medicine Co.* v. *Wood,* 108 U. S. 218.   To our minds the principle seems so sound that we think it should be applied here even if it has not been previously applied.   On that ground we think the judgment of the Appellate Court was right, and it is affirmed.

*Judgment affirmed.*