(No. 18436.—)
THE CARPENTERS' UNION *vs.* THE CITIZENS COMMITTEE
TO ENFORCE THE LANDIS AWARD *et al.* Appellees.—
(HARRY JENSEN *et al.* Appellants.)

*Opinion filed December 20, 1928.*

226

DeYoung, C. J., took no part.

Hope Thompson, for appellants.

Sims, Welch, Godman & Stransky, and George W. Miller, (Elwood G. Godman, James S. Handy, and James L. Coleman, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

A bill for an injunction was filed in the superior court of Cook county on October 31, 1922, by certain members of the United Brotherhood of Carpenters and Joiners of America, a voluntary, unincorporated association, in behalf of themselves and of all other members of the brotherhood in Cook and Lake counties, Illinois, who exceed 20,000 and belong to thirty-six subdivisions of the brotherhood called local unions, against the Citizens' Committee to Enforce the Landis Award, a corporation not for profit, organized under the laws of the State of Illinois, and 179 individual defendants. An amended bill was filed on March 1, 1924, three additional complainants being joined with the original five. The defendants answered, a replication was filed, the cause was heard, and on February 19, 1926, a decree was rendered dismissing the bill for want of equity. This decree was affirmed by the Appellate Court for the First District, which, having made the necessary certificate of importance, allowed an appeal to this court, and four of the complainants have perfected their appeal.

The prayer of the bill was for an injunction restraining the defendants from maintaining a combination for the purpose, or with the effect, of exerting influence upon bankers, architects or employers in the building industry in Chicago and vicinity, which in any way interferes with, obstructs or hinders freedom of contract between such employers and complainants; from combining and conspiring in any manner to interfere with, injure or disturb the employment of complainants or to restrain freedom of contract between complainants and employers in the building industry in Chicago and vicinity; from coercing, soliciting, advising, inducing or attempting to induce any person to refuse to employ complainants or to refuse to negotiate with complainants' authorized representatives; from enforcing or attempting to enforce any agreement which has for its

purpose or effect any restraint upon freedom of contract between complainants and employers and from soliciting or inducing any person to enter into any such agreement; from attempting to interfere with or disturb or prevent employment of complainants by newspaper advertisements, telephone messages, letters, circulars, notices, personal conversations, economic pressure or any other means; from designating or referring to the Carpenters' Union as an "outlaw" and from referring to said union or its officials as "criminals," "grafters," or similar opprobrious epithets; from attempting to establish or maintain the so-called "open shop" in the carpenters' trade in Chicago or in any way to interfere with, hinder, disturb, disrupt or injure the Carpenters' Union; from advertising for, soliciting or inducing non-union carpenters to come to Chicago in furtherance of said conspiracy; from assaulting, threatening or intimidating any of complainants; from sending men upon and around buildings in the city of Chicago to represent themselves as deputy sheriffs, to wear a deputy sheriff's star and to carry concealed weapons; from boycotting, or inducing, aiding, advising or influencing any person to boycott, complainants, either individually or as an organization; from doing any other thing to injure or interfere with complainants or their employers; and that the court may ascertain complainants' damages by reason of the unlawful acts of defendants and may decree that defendants pay to complainants such sum as it shall find to be just, and for general relief.

The appellants will be referred to as complainants, the appellees as defendants, and the United Brotherhood as the Carpenters' Union, the name by which it is commonly known in the counties of Cook and Lake.

On June 1, 1918, and for many years before, there existed in Chicago an organization of employers of carpenters known as the Carpenter Contractors' Association, and on that date an agreement was made between it and the Carpenters' Union, to continue in force until May 31, 1921,

covering working rules and conditions and wages. Before the expiration of this agreement the Carpenter Contractors' Association merged with the mason contractors and other organizations, forming a new association called the Associated Builders. There was also another association of contractors known as the Building Construction Employers' Association, and besides these association contractors there were from 1000 to 1200 independent contractors employing carpenters. Before the expiration of the agreement the joint arbitration board for which it provided met for the purpose of making a new agreement but was unable to agree upon its terms, one of the subjects of disagreement being the rate of wages, which the contractors insisted should be one dollar an hour while the carpenters demanded $1.25 an hour, the rate which they were then receiving. The union did, however, make new agreements for one year from May 1, 1921, on their own terms, with many independent contractors.

Practically all the carpenters working in Chicago were members of the Carpenters' Union. Agreements which had been made with many other trades engaged in building construction through their respective organizations also expired in the spring of 1921 and some of these were not renewed. Because of the failure of agreement between the Carpenters' Union and the Associated Builders, as well as the expiration of agreements with other trades engaged in the building industry, among other causes, much uncertainty existed in the building trades, which operated to curtail greatly building construction. The Building Construction Employers' Association was an organization of employers representing twenty-three trades and about sixteen trade organizations. It had about six hundred members who were individual contractors, including also the trade organizations represented. The Building Trades Council was an organization composed of trade organizations in the building industry in Chicago, including laborers. The Carpenters' Union was affiliated

with the Building Trades Council. The Employers' Association in the latter part of April, on account of the expiration on May 1 of the agreements in some trades,—particularly the carpenters and bricklayers, hoisting engineers and laborers,—took action declaring that the organization did not deem it advisable for the employers to continue employing labor in those trades until arrangements had been made respecting the wage rate for 1921, and the members of the association did not continue employing mechanics in the building trades after May 1, after the agreements expired, and generally ceased building operations on May 1. After that time conferences were held by the Employers' Association and the Trades Council with reference to a settlement of the differences between the employers and the various trades. These resulted in an agreement dated June 10, 1921, between the Employers' Association and the Trades Council, both for themselves and all of the respective affiliated associations and unions, whereby it was "mutually agreed that for the purpose of effecting the immediate adjustment of the existing controversy respecting the rate of wages to be paid employees in building construction and to consummate satisfactory working agreements by the construction industry, that the entire subject matter in all of its phases shall be referred to an umpire, with full power and authority to act and decide all questions involved." The umpire selected was Judge Landis, of the United States district court. Judge Landis would not accept the position unless the men were directed to resume work at the old rate of wages until he made his decision. The contractors immediately ordered the men back to work at the old rate. The Carpenters' Union, though affiliated with the Trades Council, refused to take any part in the arbitration or recognize the submission. Judge Landis' award was announced on September 7, 1921. The award stated: "The following trades are not in this arbitration: Carpenters, elevator constructors, plasterers, sheet metal,

painters, glaziers, fixture hangers. Early in the arbitration a tentative carpenters' agreement was submitted. That document is at variance with the new uniform agreement in several particulars. It provides double time for all overtime; it requires eight hours' pay for seven hours' work, shift time; the work covered by the agreement harbors jurisdictional disputes with other trades; it provides that should any other trade under control of the party of the first part do any work claimed by the carpenters, then that work shall cease until the matter is taken up by the joint arbitration board. Should this agreement be re-written according to the uniform agreement, uniform suggestions and principles, the wage would be fixed on the same scale as others, at one dollar per hour."

The award contained provisions conditionally fixing also the wages of the other trades mentioned as not in the arbitration. The award contained also the following statement: "Some of the trades, such as the carpenters, plasterers and painters, have seen fit to hold aloof from the arbitration. Therefore, in applying a wage scale to the new conditions of the trades that are here, I do so with the distinct understanding that those trades that have refused to come in and revise their agreements along just and reasonable lines, as most of you have done, will not receive your support of their wasteful and subversive practices, for this would be to permit them to capitalize your good work to their advantage and to your detriment. The highest dictates of both morality and interest require that you adopt and adhere to this policy."

After the award was promulgated, meetings of the arbitration board, representing the Associated Builders and the Carpenters' Union, were held, at which agreements were submitted on the part of the employers suggesting a rate of wages of one dollar an hour and on the part of the carpenters fixing the rate at $1.25 an hour. No agreement was reached, and the negotiations closed with the declaration

of one of the members of the arbitration board representing the Carpenters' Union, who is one of the complainants, that the employers would have to come to his terms, and when an agreement was made would have to sign at the bottom of a blank sheet of paper and he would write the agreement above the signature. Upon the failure of these negotiations the Employers' Association and the Associated Builders undertook to provide for the employment of carpenters and workmen in the other trades, about ten in number, which had refused to participate in the arbitration or to observe the Landis award and the resumption of building construction in accordance with the terms of the award. A joint committee of the Employers' Association and the Associated Builders was organized to provide for the resumption and continuance of building construction under the terms of the Landis award, which the carpenters and other trades which did not accept the award were interfering with by their refusal to work under its terms. The employers established an employment bureau, imported carpenters and workmen in other trades, who were employed under the terms of the Landis award, employed guards to protect the work and provided insurance against damage to it. In a few weeks the contractors expended $100,000 or more in these efforts. The contractors having become convinced that they were unable to continue the financial struggle without assistance, decided to call a conference of the business interests of the city. This was done, and a meeting was held in the latter part of October which was attended by representatives of the Chicago Association of Commerce, Chicago Employers' Association, Associated Builders of Chicago, Building Construction Employers' Association, Structural Engineers of Illinois, Chicago Vehicle Builders' Association, Illinois Manufacturers' Association, American Institute of Architects, (Chicago chapter,) Illinois Society of Architects, Western Society of Engineers, Cook County Real Estate Board, Chicago Real Estate Board, and the

mortgage bankers and the stock yards interests. Fifty or sixty people or more were present. Statements were made on behalf of the contractors in regard to the controversy in the building trades, the submission to arbitration and the award, and the efforts of the two associations to operate in accordance with the award, as they had agreed to, and the refusal of some of the unions to do so. The amount of money which the association had already spent and the necessity for further sums to carry on the work were mentioned, and the statement was made that the employers felt that at that time it was a matter for the people of Chicago to take hold of and carry on the fight, as the effort to enforce the award was a matter for the people more than for the contractors. The following resolution was adopted:

"*Be it resolved,* That the Landis wage awards, recommendations, principles and conditions in the recent building trades arbitration in Chicago be unanimously approved, and that a committee comprised of representatives from each group present be appointed to take the necessary steps to insure the carrying out of the Landis award."

At a subsequent meeting it was decided to appoint a citizens' committee to co-operate with the contractors in carrying out the Landis award. Mutual pledges were given that the citizens' committee would become a permanent organization and that the contractors would observe and maintain the terms and principles of the Landis award. The committee was appointed, consisting of the individual defendants, and on November 15, 1921, was organized as the Citizens' Committee to Enforce the Landis Award. The committee was incorporated by that name as a corporation not for profit, November 28, 1921. Its purpose set out in its articles of incorporation was: "To enforce the award made by Kenesaw M. Landis on September 7, 1921, of wages to be paid in the building industry in Chicago, Illinois, to enforce the agreements and principles upon which said wage award was made, and to establish and maintain equitable

and fair conditions in the building industry in Chicago and vicinity." Among the members of the committee were lawyers, merchants, bankers, brokers, owners of hotels, office buildings and other buildings, building contractors and representatives of other business interests in Chicago and of the wealth of the city. They represented great financial strength and were of great influence, economical and otherwise, in the city. In their effort to enforce the Landis award they contributed or collected and expended large sums of money, which amounted to more than $3,000,000 at the time of the decree in this case.

The object of the formation of the committee stated in its articles of association was lawful. To enforce the agreements and principles upon which the wage award was made was a lawful purpose, and to establish and maintain equitable and fair conditions in the building industry in Chicago and vicinity was a commendable motive. A lawful purpose and a good motive do not, however, justify unlawful action in accomplishing the purpose. Any person had the right to advocate the reasonableness, propriety and justice of the Landis award or the contrary and to use whatever influence he possessed to secure or to defeat its observance, provided that in so doing he did not unlawfully interfere with the legal right of another. He could lawfully advise acceptance or rejection of the award, express and maintain his views by discussion, by writing and speaking, and by persuasion seek to have the award accepted and acted upon, or rejected, by contractors, by workmen, by owners of buildings or by persons contemplating building. If he were a contractor he could employ workmen only under the terms of the award and refuse to employ others, or he could refuse to employ workmen under its terms and employ others without regard to those terms, or if he were a workman he could refuse to agree to work under the terms of the award or otherwise than under its terms. If he were an architect he could decline to recommend a contractor who would not

agree to build under the terms of the Landis award or one who would not contract to build except under such terms. If he were a banker he might refuse to lend money to an owner or contractor unless he would build under the award or to one who would build only under the award. All this any person had the lawful right to do, but the right was subject to the qualification that in doing so there was no unlawful interference with the legal right of another.

The principles of law involved in this case have been definitely settled by the decisions of this court. In *Doremus v. Hennessy*, 176 Ill. 608, it is said: "It is clear that it is unlawful and actionable for one man, from unlawful motives, to interfere with another's trade by fraud or misrepresentation, or by molesting his customers or those who would be customers, or by preventing others from working for him or causing them to leave his employ by fraud or misrepresentation or physical or moral intimidation or persuasion, with an intent to inflict an injury which causes loss. A conspiracy may, when accompanied by an overt act, create a liability, by reason of the fact that one or more conspirators may do an unlawful act which causes damage to another, by which all those engaged in the conspiracy for the accomplishment of the purpose for which the injury was done, and which was done in pursuance of the conspiracy, would be alike liable, whether actively engaged in causing the loss or not. For acts illegally done in pursuance of such conspiracy, and consequent loss, a liability may exist against all of the conspirators. * * * Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will, and anyone who invades that right without lawful cause or justification commits a legal wrong, and, if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong. Damage inflicted by fraud or misrepresentation, or by the use of intimidation, obstruction or

molestation, with malicious motives, is without excuse, and actionable. Competition in trade, business or occupation, though resulting in loss, will not be restricted or discouraged, whether concerning property or personal service. Lawful competition that may injure the business of another, even though successfully directed to driving that other out of business, is not actionable. Nor would competition of one set of men against another set, carried on for the purpose of gain, even to the extent of intending to drive from business that other set and actually accomplishing that result, be actionable unless there was actual malice. Malice, as here used, does not merely mean an intent to harm, but means an intent to do a wrongful harm and injury. An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the right of another it is malicious, and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition."

In *London Guarantee and Accident Co.* v. *Horn,* 206 Ill. 493, it is said: "Malice, in its legal sense, means a wrongful act done intentionally, without just cause or excuse; the willful violation of a known right." While competition in trade, employment or business, using the term in its ordinary meaning, may be a sufficient justification, in law, for procuring the discharge of another from employment, the mere fact that the person procuring such discharge has a temporal or pecuniary interest to be served by the act is not such justification. It was therefore held that one whose discharge from employment was procured by a third party has a right of action against such party, where the employment, although terminable at will, would have continued indefinitely but for his interference, and where his only motive was to injure the employee because the latter refused to release a cause of action, unconnected with the continuance of the employment, for which such third party was liable. In the similar case of *Gibson* v. *Fidelity and*

*Casualty Company of New York,* 232 Ill. 49, it was held that an employee had no cause of action against his employer, where the employment was at will, for discharging the employee either with or without cause or from a malicious motive, yet if the discharge was procured by a third person with the motive of injuring the employee the latter had a right of action against the third person. In *Puringto*n v. *Hinchliff,* 219 Ill. 159, it is said: "No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any loss willfully caused by such interference will give the party injured a right of action for all damages sustained. All parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable for all overt acts illegally done pursuant to such conspiracy and for the subsequent loss, whether they were active participants or not."

The cases which have been cited were all common law actions for damages. In *Wilson* v. *Hey,* 232 Ill. 389, the complainants filed a bill for injunction restraining the defendants from interfering with the appellees and their employees and from boycotting the appellees, their teams or vehicles or business, and from giving notices with the intent or calculated to deter the public from doing business with them, and an injunction was granted against putting the appellees or their employees on the unfair list and from boycotting appellees or attempting to induce or compel their customers to withold their trade from the appellees, and from menacing or interfering with their business. It was held that "the right of laboring people to organize for the purpose of promoting their common welfare by lawful means is fully recognized. They may refuse to work for any particular employer and may obtain employment for their members by solicitation and promises of support in trade and otherwise, but in the accomplishment of their

purpose they must proceed only by lawful and peaceable means, and they have no right to make war on other persons. It is not wrong for members of a union to cease patronizing anyone when they regard it for their interest to do so, but they have no right to compel others to break off business relations with the one from whom they have withdrawn their patronage, and to do this by unlawful means, with the motive of injuring such person. Such means as giving notices which excite the fear or reasonable apprehension of other persons that their business will be injured unless they do break off such relations or cease patronizing another are wrong and unlawful. If the notices given or things done have the natural effect of exciting such reasonable fear and apprehension and accomplish the result intended it is immaterial that they are not accompanied by direct threats."

The law is well settled in Illinois by the decisions which have been cited, and the principles announced in those decisions are in accord with those announced generally by the courts of our sister States and the Federal courts. Every person has a legal right to carry on any legitimate business and make and enforce all lawful contracts in its prosecution. Every man has a right to full freedom in the disposal of his labor according to his will, and workmen have a right to organize for the purpose of promoting their common welfare by lawful means. They may impose any condition of their employment which they may regard as beneficial to them, and, if not bound by contract, may abandon their employment at any time, either singly or in a body, with or without cause. They have the right to a free and open market in which to dispose of their labor. No person or combination of persons has the right, directly or indirectly, to interfere with or disturb another in his lawful business or occupation or for the sake of compelling him to do some act which in his own judgment he does not approve. Losses caused by willful interference, with-

out legal cause or justification, with the relations of employer and employee or with their freedom to contract are maliciously caused and will sustain an action at law, or, in a proper case, an injunction may be obtained to restrain the wrongful interference.

To summarize briefly, the whole controversy of which this suit is a result grew out of the refusal of the carpenters and some other trades in the spring of 1921 to renew the contracts with the association of employers, which had before that time existed but then expired, in regard to wages and conditions of employment, resulting in the suspension, to a great extent, of building operations in the city of Chicago and in Cook county. Negotiations between the Employers' Association and the Trades Council resulted in the submission of the controversy to arbitration and the promulgation of the Landis award. The Carpenters' Union and several other unions refused to participate in the submission, but the award purported to fix, tentatively, wages in those trades should they accept the award. These unions refused, however, to recognize the award and declined to enter into contracts according to its terms, and the Employers' Association and Associated Builders undertook to resume and continue building operations on the basis of the award. Since the Carpenters' Union included practically all the carpenters and the other unions rejecting the award persisted in their refusal to make contracts according to its terms building operations were greatly hampered, and the employers and contractors appealed for help to the citizens of Chicago, which was given in the manner which has been stated. The reasonableness, propriety or justice of the award is not a subject for consideration here. The Carpenters' Union was not bound by it. The carpenters had a right to refuse employment under its terms and contractors had a right to refuse to employ carpenters except under its terms. Everyone else had a right to try to procure the

observance of the award or to prevent it, if he did not by his action interfere unlawfully with the right of another.

The first question for determination therefore is whether the acts of the defendants constituted an invasion, without just cause, of the legal rights of the union carpenters. The decree, being a simple order of dismissal based on a general finding of the equities of the case in favor of the defendants, contains no specific findings of fact. The Appellate Court affirmed the decree. All of the judges agreed that at least some of the acts of the defendants were in violation of the legal rights of the complainants, but in the opinion of two of the judges the complainants were not entitled to any equitable relief, which might otherwise have been granted, because they had themselves been guilty of such inequitable conduct and of such acts of violence and coercion in connection with the controversy that they do not come into equity with clean hands, and must be denied relief upon the principle of jurisprudence that whoever appeals to a court of equity for relief must do so with clean hands. The third judge filed an opinion concurring with that of the other two that the conduct of the defendants violated the rights of the complainants but dissenting from the proposition that the bill of the complainants should not be entertained because of their unclean hands, and therefore dissenting from the judgment affirming the decree. An extended discussion of the evidence is unnecessary. A statement of our conclusions will be sufficient for this opinion. We agree generally with the findings of the Appellate Court. The two opinions differ in the importance which they attach to particular transactions, but the judges are unanimous in holding the defendants guilty of actionable wrongs against the complainants and they differ in regard to the application of the doctrine of unclean hands.

The defendants, except those who were personally interested in the building industry, had no direct interest in the controversy between the carpenters and the employers.

They were not employers of carpenters or interested directly in the building trades. They were volunteers in the controversy between the contractors and the unions which were not working under the Landis award, the largest of which was the Carpenters' Union. Thomas E. Donnelly, the chairman of the executive committee of the Citizens' Committee, was engaged in the printing business. He addressed a meeting of the Chamber of Commerce at the LaSalle Hotel, at which about 1000 people were present, on the subject of the controversy between the contractors and the unions, stating that some of the unions which had come into the arbitration had refused to abide by the terms of the award although they had pledged themselves to do so. Though the Carpenters' Union had never pledged itself to abide by the terms of the award, Donnelly referred to it, as well as those who had so pledged themselves, as recalcitrant unions, and closed his speech by asking those present, "when you hear of anybody that is carrying on building that is not according to the Landis award, to tell that man what you think of him, and don't be afraid to tell him straight. * * * Anybody from now on who starts a building in Chicago and who does not insist that the contracts shall be made so that the contractor must work one hundred per cent under the Landis award is betraying his city, and we have got to depend upon you to make that man feel ostracized the same as were those who during the war did not come through one hundred per cent American." A pamphlet was circulated by the defendants among architects and contractors, stating in substance that the state of the public temper then prevailing made it clear "that a contractor who refuses to go along now is declaring himself 'out' as a good citizen;" and it was further stated that when the "war for decency" then being waged had been won, those who had refused their co-operation would be "justly regarded as having given 'aid and comfort to the enemy,' which is the language used in the constitution of the United States to de-

fine treason." In another pamphlet the Carpenters' Union and those who had broken their agreement to abide by the terms of the decision were referred to as "these ten outlaws." Pamphlets circulated by the defendants contained the statement that there would be "rough seas ahead" for all "contractors, labor organizations and others who do not assist in making the Landis award one hundred per cent plan of operation," and asked if those to whom it was sent had been "called on the carpet" as yet by the Citizens' Committee, and suggested that if they had not, it would be best to so conduct themselves that they would not be, "for it has been reported that some contractors who had already appeared before the committee spent an uncomfortable half hour." The pamphlet stated that contractors doing eighty-five per cent of the building work in Chicago at that time were pledged to sustain the Landis award and that forty-four out of fifty-one trades were abiding by its terms; "that the other fifteen per cent of both employers and labor unions may be classed as outlaws and outcasts, and the citizens of Chicago have formed a permanent organization to handle them without gloves." In a letter sent out by the defendants in soliciting funds it was stated that the defendants were endeavoring to save Chicago's building industry "from the grasp of the slimy, deadly tentacles of these devilfish who are after the financial lifeblood of every little home and every big building;" that if the "war" then on was not won, life in Chicago would be "utterly in the hands of blackmailers, sluggers, professional gunmen, convicts and criminals, to take when and where they please." Advertisements were published frequently in the daily newspapers referring to labor unions as a crime syndicate; stating that the building industry was rotten to the core with graft, waste and conspiracy; asking the citizens if they wished to see the gangsters and terrorists rule our city with the bomb, the blackjack and the gun; stating that Landis award jobs must be guarded, that bombers, sluggers

and would-be murderers may be held at bay, and stating that the convict-led labor unions which have been fighting the Landis award have now descended from slugging and bombing to wanton and cold-blooded murder, but the work of the Citizens' Committee will go on until it has rid Chicago entirely of this menace. Donnelly stated further in a speech at a public meeting that the Citizens' Committee had definitely declared the open shop in those trades that were not in, and in those trades their foremen would be non-union men, and that the Citizens' Committee would not deal with any representative of those unions, and that the contractors had agreed with the Citizens' Committee that henceforth they would allow the Citizens' Committee to dictate their labor policies; that if the contractors repudiate their agreement the Citizens' Committee would find other contractors in Chicago or employ them from outside; that the Citizens' Committee would use its influence to see that the contractors who thereafter complied with their agreements got the major part of the business. Besides establishing the employment bureau the committee took pledges from contractors to have no negotiations with representatives or officers of unions refusing to abide by the Landis award and brought in thousands of carpenters from other places pledged to work only under the Landis award. It employed investigators to report on all jobs, whether proceeding under the Landis award or not. Where the work was proceeding not under the award the committee wrote to the contractors in regard to their violations and sent the reports to the Contractors' Association, asking it to use its influence. Of the letters written to contractors, one sent to George F. Gonsalve contains the following: "Our investigators report that you are not running your work at Winnetka, Ill., under the Landis award in the carpenter trades. * * * This committee asks you to please change your present practices and join the eighty-five per cent of the contractors in the city and vicinity who

had aligned themselves with it [the Landis award.] Ours is an absolutely non-partisan group, composed of 179 of the leading business and professional men of this city, interested solely in seeing that the Landis award is lived up to in all its phases. We hope to hear from you within the next few days that you are working with us." Letters were sent to the architects, asking them to sign a pledge and enforce the Landis award. The pledge asked, provided that the architects in awarding contracts should insist that the work should be done under the Landis award and its recommendations, and that each contract should provide that it could be canceled if the contractor failed to abide by the terms of the award. The committee conferred with the Mortgage Bankers' Association, appealing to it to cooperate, and sent letters to the bankers asking them to support the Citizens' Committee and to insist that borrowers in the case of building operations let their contract only to those who had signed up with the committee. Articles which the committee caused to be published in the daily papers announced that the Carpenters' Union was the only union that was "outlawed;" that it would never be able to negotiate a wage agreement again; that certain contractors who employed union men hampered the Citizens' Committee; that it was the duty of every builder to insist that his work be done by contractors who had signed up with the committee, and intimated that those who did not so sign up declared themselves bad citizens.

The natural result of these statements of the defendants was to interfere with the relation of the contractors and other persons engaged in the building industries, the employers of labor and their employees, by compelling or inducing the employers to boycott and refuse to employ workmen who were members of the Carpenters' Union unless they would accept employment under the terms of the Landis award, and thus violate the rules of the union and subject themselves to the penalties of fines and expulsion

from the union, and the threats, express and implied, if successfully carried out, would eventually result in the destruction of the union. The purpose of the committee to injure the complainants appears clearly. The belief of the committee is manifest from the evidence in the record that the Landis award was just and should be accepted by all persons interested in the building industry, whether as employers or employees, and whether or not they had consented to the submission of the subject of their controversy to the arbitration of Judge Landis and agreed to be bound by his award; that the attitude of the carpenters was arbitrary, unreasonable and opposed to the general public interest; that they should be compelled by the force of public opinion to yield submission to the terms proposed in the award to be fixed in relation to the work of carpenters in case the agreement between their union and the Employers' Association should be re-written in accordance with the uniform agreement, suggestions and principles mentioned in the award, and that the committee should apply pressure, economic, business and social, upon contractors who were willing to employ carpenters on terms not in accordance with the Landis award and upon carpenters who were not willing to work under the Landis award, by causing "rough seas ahead" for all contractors, labor organizations and others who do not assist in making the Landis award "one hundred per cent plan of operation." It is also clear from the evidence that the committee proceeded to exercise such pressure in the manner and by the means which have been stated, and that in some cases it was successful in its efforts to disrupt relations between employers and their employees who were members of the Carpenters' Union and to prevent the employment of members of the union. The fact that the defendants acted with a good motive in what they believed to be for the public interest is no justification for their unlawful acts of interference with the rights of the complainants to freedom of market for their labor, to

collective bargaining with employers, to demand, bargain for and receive such wages under such terms and conditions of employment as they might be willing to accept, unhampered by the interference of others having no legal interest in the relation between them and their prospective employers.

No persons, individually or by combination, have the right to directly or indirectly interfere with or disturb another in his lawful business or occupation or for the sake of compelling him to do some act which in his own judgment his own interest does not require. Losses willfully caused by another from motives of malice to one who seeks to exercise and enjoy the fruits and advantages of his own enterprise, industry, skill or credit will sustain an action. It is unlawful and actionable for one man from unlawful motives to interfere with another's trade by fraud or misrepresentation, physical or moral intimidation or persuasion, with intent to inflict an injury which causes loss. Though the complainants had the right to be free from wanton disturbance and annoyance in seeking to enjoy the fruits and advantages of their labor, industry and skill, they have no right to be protected against competition. While a person must submit to competition, he has the right to be protected from malicious interference with his business. Lawful competition which may injure the business of a person, even though successfully directed to driving him out of business, is not actionable. Competition, however, does not include all conflicts of temporal interest, and does not apply in the case of the efforts of a stranger to a controversy between employers and employees in regard to their business relations, to compel the action of either or to injure either for the purpose of compelling him to yield to the other the absolute legal right to manage his own business in his own way. "No one can legally interfere with the employment of another unless in the exercise of some right of his own which the law respects." (*Berry* v. *Donovan,* 188 Mass.

353.) The complainants and defendants were not in competition in any sense and there was no justification for the defendants' acts on that ground. The interference of the defendants in the controversy between the Carpenters' Union, whose members declined to work under the Landis award, and the employers who desired all work to be done under the Landis award, was unauthorized by law and was therefore malicious. Coercion is as easily accomplished without threats of violence as with them, and fear of loss of or injury to business unless one submits to demands is as effective as fear of violence to his person. No person has a right to make war on another and to compel others to break off business relations with him to his injury. If an evil motive does not make a lawful act unlawful, it is equally true that what may be regarded as a good motive will not make an unlawful act lawful. What the defendants did amounted to an indirect illegal boycott against the complainants, which was defined in *Duplex Printing Press Co. v. Deering,* 254 U. S. 443, as a combination to exercise coercive pressure upon employers, actual or prospective, in order to cause them to withhold or withdraw patronage through fear of loss or damage to themselves if they should deal with the complainants. The purpose of the injunction was to put a stop to acts of the defendants in applying pressure to employers of the complainants to induce them not to employ or contract with the complainants.

The Appellate Court sustained the contention of the defendants that the complainants came into court with unclean hands and were therefore entitled to no relief. The maxim, "he who comes into equity must do so with clean hands," only applies "to the particular transaction under consideration, for the court will not go outside of the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing." (Bispham's Principles of Equity, p. 49.) "The wrong must have been done to the defendant himself

and must have been in regard to the matter in litigation." (*City of Chicago* v. *Union Stock Yards Co.* 164 Ill. 224.) In the case cited it was held that the fact that a railroad company authorized by its charter to maintain a railroad for certain purposes has used such road for unauthorized purposes will not prevent its obtaining relief for the unlawful removal of its track, on the ground that it does not come into court with clean hands.

The uncleanness of the complainants' hands alleged to require their exclusion from entrance into a court of equity, and the denial of a hearing of their cause of action against the defendants because of their unlawful interference with the constitutional rights of the complainants, was caused, as the defendants claim, by the wrongful and unlawful conduct of the complainants in their controversy with the contractors, employers and non-union carpenters by the use of force, intimidation and physical violence against the workmen of the contractors and employers to prevent the prosecution of building operations except upon terms satisfactory to the complainants. None of this misconduct affected in any way any right of the defendants who were not directly interested in the subject matter of the original controversy between the Associated Builders and the Building Construction Employers' Association on the one hand and the Carpenters' Union on the other. No legal or business relations of any kind existed between the Carpenters' Union and such defendants. The Citizens' Committee was formed for the purpose of enforcing the award and establishing and maintaining equitable and fair conditions in the building industry, and so far as its efforts in effecting its purpose were confined to lawful means its activities gave rise to no legal cause of complaint. Unlawful acts in an endeavor to effect a lawful purpose are, however, as wrongful and injurious as the same acts done to effect an unlawful purpose. A good motive does not relieve from liability the doer of a wrongful act injurious to another. When the

defendants undertook to regulate and control the relations of the contractors and their employees by the means which the evidence shows they adopted, their conduct was wrongful. When they undertook to interfere with and supervise the work of the contractors and their relations with their employees and require the contractors to allow the committee to dictate their labor policies, they were guilty of unlawful interference with the right of the complainants to a free market for their labor and to freedom of contract with any employer of their labor. The only business of the Citizens' Committee was to enforce the Landis award and establish and maintain equitable and fair conditions in the building industry. Some of the defendants had no interest in the controversy between the Carpenters' Union and the contractors different from that of every other citizen of Chicago—the public interest. Their injection of themselves into that controversy became unlawful because of the unlawful means which they adopted to control and suppress it. When by such means they came into the controversy in aid of one of the parties, their intervention to coerce the settlement of the controversy in accordance with their will was that of intruders upon the rights of strangers. They acquired no standing in the controversy by joining one of the parties to it. The consent of one of the parties could not enlarge the right of such of the defendants as were not directly interested in the subject matter of the original controversy between the Associated Builders and the Building Construction Employers' Association on the one hand and the Carpenters' Union on the other to interfere by unlawful means in the controversy. The law declares and limits such right, and the defendants by engaging on one side of the controversy did not enlarge their rights against the other. The relation of the defendants to the alleged misconduct of the complainants was not different from the relation to it of the public generally. The complainants' acts of misconduct may have been violations

of the criminal law, which might have been punished by public prosecution, but a court of equity has no power to punish the complainants for them by refusing to consider their complaints of other disconnected wrongs done to them by the persons affected by their criminal acts or of any wrongs done to them by other persons not directly affected by such criminal acts. The rule that a complainant must come into equity with clean hands means that he must do equity as respects the defendant's rights in the particular matter of the suit. (1 Pomeroy's Eq. Jur. sec. 307.) The rule does not go so far as to prohibit a court of equity from giving its aid to a bad or a faithless man or a criminal. The dirt upon his hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction his hands are as clean as the court can require. (*Ansley* v. *Wilson,* 50 Ga. 421.) The acts of the defendants interfered with and injured the complainants in the enjoyment of their constitutional rights, and so far as the complainants were concerned no acts of theirs in any way affected any lawful right of such defendants as were not directly interested in the subject matter of the original controversy between the Associated Builders and the Building Construction Employers' Association on the one hand and the Carpenters' Union on the other.

The defendants rely upon the cases of *American University* v. *Wood,* 294 Ill. 186, and *Scranton Electric Light and Heat Co.* v. *Scranton Illuminating Heat and Power Co.* 122 Pa. St. 154, in support of their position on the question of unclean hands. In both those cases the complainant corporations were held by the conduct of their business to be operating a fraud on the public. In *American University* v. *Wood, supra,* a bill was filed by the complainant for an injunction restraining the defendant from circulating letters and advertising matter derogatory of the complainant and its business. The evidence showed that the complainant in

the conduct of its business was practicing a fraud on the public. By misleading advertisements it falsely represented itself as an educational institution with various departments, with a faculty composed of men, each of whom was a recognized specialist in his department and a practitioner and teacher of wide reputation, superior to that of any other institution, and that the university extension or home-study course of the department was for the benefit of those who had not the means or did not wish to incur the expense of attending the university to receive personal instruction but that such instruction was given to those who desired it, the fact being that the complainant gave instruction in no other way than by correspondence. It was held that the misrepresentations of the complainant in the conduct of its business affected the public and were a fraud upon it. While it was recognized that the rule that he who comes into equity must come with clean hands was not intended to bar everyone guilty of wrongful conduct from relief in a court of equity, as a general rule it was required that the wrongdoing or fraud of the complainant, to bar him from relief on the ground that he comes with unclean hands, must be connected with the subject of the litigation and have some relation to the rights of the parties arising out of the transaction; but on grounds of public interest and policy the complainant's grievance, which had its origin in fraud on the public and the deception by which that fraud was perpetrated, was not of a character to be redressed in a court of equity; "that it is no part of its function to aid a litigant in the promotion of a fraud upon the public."

The Carpenters' Union is a lawful organization and its rights in equity are governed by the ordinary rule prevailing between litigants. The wrongdoing or fraud of a complainant, to bar him from relief on the ground that he comes with unclean hands, must have some relation to the rights of the parties arising out of the transaction. The complainants' cause of action had its origin not in any fraud

practiced on the public or any wrongdoing of the complainants, but in a disagreement between the carpenters and the employers of carpenters. Misconduct of either party in connection with that controversy did not put the guilty one outside the pale of the law or equity, make him an outlaw, or authorize a stranger to interfere with and injure the right of the party guilty of the misconduct with immunity against being called into a court of equity and enjoined from his unlawful interference with the other's right. "Where it is alleged that a legal wrong has been done, the first question to consider is the right of the party who alleges the wrong, and not to begin with the question whether the alleged wrongdoer would be benefited by his act. (*Carlson* v. *Carpenter Contractors' Ass'n of Chicago,* 305 Ill. 331.) If it is found that the right existed, it could only be invaded by one who had an equal or superior right. Any idea that one may deprive another of a right by compelling others to break off business relations with him because it will benefit the person doing the wrong is utterly baseless. In most cases the wrongdoer anticipates some advantage or benefit to himself, and in this case the only benefit claimed was not direct, but the remote one of requiring a manufacturer of millwork to operate a closed shop and employ only union labor." (*Anderson & Lind Manf. Co.* v. *Carpenters' District Council,* 308 Ill. 488.) In the present case the only benefit claimed to the defendants not personally interested in the building industry was not direct but the remote one of the effect of the failure to enforce the Landis award on general business in the community.

The defendants insist that none of the complainants named in the bill are entitled to any relief, and that therefore no relief can be granted to any of the complainants, named or unnamed. The amended bill sets forth that the United Brotherhood of Carpenters and Joiners of America is a voluntary association of which the eight persons named as complainants are members, Harry Jensen being its presi-

dent, Charles H. Sand the secretary-treasurer, Mark D. Taylor, Thomas E. Ratcliff and Fred C. Bromley business agents of the Chicago District Council of the United Brotherhood of Carpenters and Joiners of America, commonly known and designated as the Carpenters' District Council, which is the representative governing body of the United Brotherhood in Cook and Lake counties, Illinois, and William J. Tornquist, William H. Schaefer and Alex Robertson being journeyman carpenters working at the trade for such employers as may from time to time employ them. While the first five named hold the offices which they now hold they are required to devote all their time to the performance of their official duties, and do not, therefore, work at the trade. The acts of the defendants which are complained of are directed against the Carpenters' Union, their tendency is toward its destruction, and if the declared purpose of the defendants is completely accomplished, the union, as the representative body of its members, will be destroyed and the complainants who are its officers will lose their official positions. The other three named complainants were journeyman carpenters employed, with several other union carpenters, by the Austin Construction Company, and on a Friday their foreman told them they had to go home until Monday morning for some reason which he did not state, but to come back Monday morning and he would put them back to work. When they returned on Monday the foreman told them he was sorry but he had to send them home. The superintendent told them that he was compelled to send them home because he had to put Landis award men on again. The union men were paid off and discharged. They wanted to know the reason, and the superintendent told them he had been forced by the architect to put on Landis award men. There was also evidence of other union men discharged by other employers for a like reason. The acts of the defendants were directed against the union as a body and all the individual

members. The contractors were required to agree to let the committee dictate their labor policy, to agree that in those trades which did not observe the Landis scale there should be an open shop, that their foremen should be non-union men, and that they would not deal with any of the unions of the trades not accepting the Landis award and working according to its terms. Had the union been incorporated the bill might have been filed by the corporation in its own name in behalf of all its members, but being a voluntary, unincorporated association the bill might be maintained by the members of the association in their names, or where, as in this case, the members are numerous and it is impracticable to bring them all before the court, the suit may be brought in the name of some of the members suing in behalf of all of the members, or it may be brought by the officers of the association or a committee appointed or authorized to prosecute it. The association had an organization, a constitution and by-laws and executive officers, consisting of a president, secretary and treasurer and other officers. The named complainants included the president, secretary-treasurer and three business agents. The suit was authorized by the district council, the governing body of the association, and the association levied an assessment of one dollar a month for three months on each member, which was approved by a referendum vote of the members, and $56,107 was received from this assessment.

In *Beatty* v. *Kurtz,* 2 Pet. 584, in which a suit was brought by and in the name of the committee of a voluntary society, regularly appointed for the purpose of perfecting the title to certain property, it was said in regard to the competency of the complainants to maintain the suit: "If they were proved to be the regularly appointed committee of a voluntary society of Lutherans, in actual possession of the premises and acting by their direction to prevent a disturbance of that possession under circumstances

like those stated in the bill, we do not perceive any serious objection to their right to maintain the suit. * * * The only difficulty is whether the plaintiffs have shown in themselves a sufficient authority, since it is not evidenced by any formal vote or writing. If it were necessary to decide the case on this point we should incline to think that under all the circumstances it might be fairly presumed. But it is not necessary to decide the case on this point, because we think it one of those cases in which certain persons belonging to a voluntary society, and having a common interest, may sue in behalf of themselves and others having the like interest as part of the same society for purposes common to all and beneficial to all." This case was cited and approved in *Guilfoil* v. *Arthur,* 158 Ill. 600, a similar suit brought by the officers of the Grand International Brotherhood of Locomotive Engineers, an unincorporated society, in behalf of the society to enforce a trust in lands and to remove the trustee. In this case the opinion says: "The bill might have been brought in the names of all the members of the Brotherhood of Locomotive Engineers as persons jointly interested in the property, but where the members of an unincorporated association are numerous, as is the case here, the action may be brought in the names of a portion of the members who sue for themselves and in behalf of all the other members, or, as was done in *Beatty* v. *Kurtz, supra,* the action may be maintained in the name of a committee of persons regularly appointed by the organization." The same rule as to parties applies to a suit against a volunteer association composed of many members. It is not necessary in such case that all the members of the association be made defendants and each be served with a summons. Where the parties are numerous and it is impracticable to bring all before the court, service upon a part to act for all the members of the association as well as themselves will be a sufficient

service upon the whole. (*Fitzpatrick* v. *Rutter,* 160 Ill. 282; *Warfield-Pratt-Howell Co.* v. *Williamson,* 233 id. 487.) The complainants were entitled to begin and maintain the suit.

It is contended for the defendants that while declarations or statements made by a person as to why he discharged an employee or discontinued business relations with another which show the state of mind are admissible, declarations or statements of facts assigned as a cause of or reason for such state of mind are inadmissible. The evidence to which this objection applies was the testimony of various witnesses in regard to the circumstances of their discharge by their employers, stating the reasons which the employer gave at the time, as, that he had to change to get Citizens' Committee carpenters or they would stop his loan on the building; or, that the representatives of the Citizens' Committee had been up to their office demanding that Citizens' Committee men be put on the job; or, that he had been forced by the architect to put on Landis award men. This testimony was clearly competent for the purpose of showing the motive of the employer's action. (3 Wigmore on Evidence, sec. 1729; *Lawlor* v. *Loewe,* 235 U. S. 522; *Gibson* v. *Fidelity and Casualty Co.* 232 Ill. 49; *Weston* v. *Barnicoat,* 175 Mass. 454; *Hubbard* v. *Allyn,* 200 id. 166; *My Maryland Lodge* v. *Adt,* 100 Md. 238.) The testimony did not prove that the bankers would hold up the loan of the employer, or that representatives of the Citizens' Committee had demanded that their men be put on the job, or that the architect had compelled him to put on Landis award men. It did show the state of mind and motive of the different employers in discharging their employees and it was competent to be received for that purpose, leaving the acts on which their fears were based to be proved by other evidence.

Under the evidence in this record the complainants were entitled to the relief by injunction prayed for in the bill

against the defendants, except those who were directly interested in the subject matter of the original controversy between the Associated Builders and the Building Construction Employers' Association on the one hand and the Carpenters' Union on the other. In the opinion of a majority of the court the complainants are not entitled to recover damages in this suit.

The decree dismissing the bill for want of equity, and the judgment of the Appellate Court affirming it, are reversed and the cause is remanded to the superior court of Cook county, with directions to enter a decree restraining the defendants, except those who are directly interested in the subject matter of the original controversy between the Associated Builders and the Building Construction Employers' Association on the one hand and the Carpenters' Union on the other, from maintaining a combination for the purpose or with the effect of exerting influence upon bankers, architects or employers in the building industry in Chicago and vicinity which in any way interferes with or hinders freedom of contract between such employers and the complainants; from combining and conspiring in any manner to interfere with, injure or disturb the employment of the complainants or to restrain freedom of contract between the complainants and employers in the building industry in Chicago and vicinity; from coercing, soliciting, advising, inducing or attempting to induce any person to refuse to employ the complainants or to refuse to negotiate with the complainants' authorized representatives; from enforcing or attempting to enforce any agreement which has for its purpose or effect any restraint upon freedom of contract between the complainants and employers and from soliciting or inducing any person to enter into any such agreement; from attempting to interfere with or disturb or prevent employment of the complainants by newspaper advertisements, telephone messages, letters, circulars, notices, personal conversation, economic pressure or

any other means; from assaulting, threatening or intimidating any of the complainants; from sending men upon and around buildings in the city of Chicago to represent themselves as deputy sheriffs, to wear deputy sheriff's star and carry concealed weapons; from boycotting or inducing, aiding or influencing any person to boycott the complainants, either individually or as an organization; from doing any other thing to injure or interfere with the complainants or their employers.

*Reversed and remanded, with directions.*

Mr. CHIEF JUSTICE DEYOUNG took no part in this decision.