**GREATER NEW YORK LIVE POULTRY CHAMBER OF COMMERCE et al. v. UNITED STATES.***

No. 190.

Circuit Court of Appeals, Second Circuit.

Jan. 12, 1931.

*Certiorari denied 51 S. Ct. 486, 75 L. Ed. ——.

See, also, 30 F.(2d) 939; 33 F.(2d) 1005.

Julius Hallheimer, of New York City (John T. De Graff, of Albany, N. Y., on the brief), for appellant Simon.

Goldstein & Goldstein and Joseph F. Kroppy, all of New York City, for other appellants.

John Lord O'Brian, Asst. to Atty. Gen., Israel B. Oseas and Walter L. Rice, Sp. Assts. to Atty. Gen., and Robert E. Manley, Acting U. S. Atty., of New York City.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

The main contention of the appellants is that the conspiracy proved restrained only intrastate commerce, of which the District Court had no jurisdiction. For an understanding of this argument, some statement is necessary of how the poultry business was conducted and how the appellants interfered with it. To summarize is necessarily to omit, and almost inevitably results in a statement which to one party or the other seems vitally defective. The summary now to be given attempts to draw the picture only in broadest outline.

At least 98 per cent. of the live poultry coming into the city of New York comes from "shippers" outside the state. They send it by carload freight to commission men who are called "receivers." About half comes in at the New York Central terminal in Manhattan, and half at railroad terminals in New Jersey. The receivers sell to "marketmen," who in general are wholesalers; they in turn sell the poultry to retail poultry dealers and butchers, who pass it on to the ultimate consumer. As soon as the poultry is inspected at the terminals, it is unloaded from the cars and put into coops; coopage being paid for by the shippers. At the terminals much of the poultry is delivered by the receivers to their purchasers, the marketmen; the rest is trucked to West Washington Street Market, at the expense of the shippers, and there sold to marketmen. The poultry is usually shipped on straight bills of lading, and the price paid by the receiver is usually the highest market price in New York for the day on which the poultry is unloaded, less charges for freight, coops, feed en route, unloading, cartage to West Washington Market, ferriage from New Jersey, if that occurs, and a commission of from 3 to 5 per cent. The marketmen cause the poultry which they have purchased from receivers either at the railroad terminals or at West Washington Market to be loaded on trucks and driven to their places of business. The work of loading and trucking at and from the railroad terminals is done by members of a Truckmen's Union, one local of which operates in New York and another in New Jersey. The poultry is slaughtered in accordance with Jewish dietary customs by members of a Butchers' Union, who are known as shochtim, and work in the places of business of the marketmen.

The appellant Greater New York Live Poultry Chamber of Commerce is a trade association whose entire membership comprised about 65 per cent. of the marketmen in greater New York. The appellant Simon held the office of supervisor in the Chamber of Commerce; and the other individual appellants are members of it. Other defendants below were the Butchers' Union, the New York local of the Truckmen's Union, and certain representatives of each. The conspiracy complained of originated in plans of the Chamber of Commerce after Simon became

its supervisor in the summer of 1927. Simon and the defendant members of the Chamber of Commerce are charged with conspiring to control the sales of poultry between the marketmen and the retailers; the city was divided into geographical areas, and to the marketmen in each area were allocated the particular retailers to whom only they should sell; against each marketman was made a levy of 1 cent a pound on poultry sold by him; if recalcitrant, he was to be prevented from obtaining poultry by purchase from receivers, this being accomplished through the aid of the unions, whose members would refuse to load or drive his trucks or to slaughter his poultry; retailers who sought to buy from others than the marketmen to whom their trade was allocated were also interfered with. Neither the shippers nor the receivers were charged with being parties to the conspiracy, but there was abundant evidence to justify the jury in finding that marketmen who did not pay the levy or did not conform to the association's allocation of trade, were prevented from obtaining poultry at the railroad terminals or the West Washington Market.

Granting all this, say the appellants, the commerce restrained was local; interstate commerce ended with delivery of the poultry to the receivers; there was no restraint of commerce between shippers and receivers; whatever restraint was shown was of commerce between receivers and marketmen or between marketmen and retailers. The government challenges the premise that interstate commerce ended with delivery to the receivers; and this issue presents the first and main question of the appeal. The appellants' chief reliance is Industrial Ass'n v. United States, 268 U. S. 64, 45 S. Ct. 403, 406, 69 L. Ed. 849; the government's, Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Binderup v. Pathe Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308; People's Gas Co. v. Public Service Commission, 270 U. S. 550, 46 S. Ct. 371, 70 L. Ed. 726.

In the Industrial Association Case it was held no violation of the Sherman Act to require permits for the use by building contractors of plaster which, after being imported from outside the state, had been brought to rest in salesrooms and warehouses and commingled with local goods. In differentiating the Swift and Stafford Cases, it was noted that in those cases the court had held that the stockyards to which the live stock was consigned and delivered was not a final destination, but "a throat through which the current flows," and the sale there made was only "an incident which does not stop the flow but merely changes the private interest in the subject of the current without interfering with its continuity." Similarly, in the Binderup Case, "the intermediate delivery did not end, and was not intended to end, the movement of the commodity, but merely halted it 'as a convenient step in the process of getting it to its final destination.'" It is true that in the live stock cases it was emphasized that the cattle were butchered at the stockyards and sent as meat to other states. If this was the controlling circumstance, it was absent here, as the appellants insist. But this feature was not mentioned in the discussion of those cases by Mr. Justice Sutherland in the opinion in Industrial Association v. United States, supra. We do not believe that the result would have been different had the steers shipped from the West to Chicago been bought for butchering and sale in the Chicago market. In People's Gas Co. v. Public Service Commission, supra, the gas company was a Pennsylvania corporation which produced natural gas from its own wells within the state and also purchased at the state line through a meter gas produced by another in West Virginia. The local and the foreign gas was mingled in the corporation's pipe lines and distributed thereby to its customers. It was held that the West Virginia gas continued to be in interstate commerce until delivery to the gas company's customers, unaffected by the passing of title and custody at the state line.

In the case at bar, the receivers did not warehouse the poultry or commingle it with local goods before disposing of it. They were merely a conduit through which flowed the daily stream of commerce from shippers to marketmen. It was clearly contemplated by the shippers that the poultry should pass through the receivers to the marketmen, for the shippers paid the charges for unloading, cooping and cartage to West Washington Market, and the price paid the shippers depended on market price made by resale to the marketmen. While the receivers cannot on this record be held to be mere agents of the shippers, as in Live Poultry Dealers' Protective Ass'n v. United States, 4 F. (2d) 480 (C. C. A. 2), their intervention as purchasers does not necessarily cause interstate shipment of the poultry to end on delivery to them. People's Gas Co. v. Public Service Commission, supra. We believe the situation is analogous to that involved in the live stock

cases already discussed, and we hold that the poultry remained in interstate commerce until sale by receivers to marketmen.

We have dealt with this problem without differentiating between poultry coming into the New York Central terminal and that coming into the New Jersey terminals. As to the latter it is conceded that interstate commerce continued until delivery at the West Washington Market, but it is urged that the evidence of interferences in New Jersey should be disregarded on the principle of de minimis, as illustrated in the Industrial Association Case. With this contention we do not agree. The number of instances does not limit the inference to be drawn from them, and the jury might well have concluded that the plan involved New Jersey deliveries as well as those in New York. Indeed, it would have to do so in order to be effective against recalcitrant New York marketmen. Nor were the New Jersey deliveries so small a part of the whole as to fall within the de minimis principle. But the judge left it to the jury to find a verdict if there was a conspiracy to interfere with interstate commerce either at the terminals or at West Washington Market. The jury may have based its verdict only upon interferences at the market or at the Manhattan terminal. So we must decide whether sales to marketmen made at those places were interstate commerce. For reasons already given, we hold they were.

█ Under the authorities it is not essential to conviction of a conspiracy to restrain interstate commerce that such restraint be the primary object of the conspiracy; it is enough if the conspiracy, though directed primarily against local trade, contemplates as a means for its accomplishment interference with interstate commerce. Here the primary object of the conspiracy was control of the poultry trade between marketmen and retailers, which may be assumed to be a local trade, but the record contains evidence to justify a finding that one of the means for effecting that object was the prevention of recalcitrant marketmen from obtaining poultry from receivers whether within or without the state of New York, and that the activity of the Truckmen's Union in preventing purchases by such recalcitrants was not merely coincidental but was part of the conspiracy.

█ A number of the assignments of error relate to the admission over objection of the testimony of witnesses for the prosecution as to reasons given by receivers for their refusal to sell to recalcitrant marketmen. Such statements of reasons, though hearsay, are admissible to prove the state of mind of the declarant if that be in issue. Lawlor v. Loewe, 235 U. S. 533, 35 S. Ct. 170, 59 L. Ed. 341; citing 3 Wigmore, Evidence, § 1729 (2); Hubbard v. Allyn, 200 Mass. 166, 86 N. E. 356. They are not admissible, however, to prove the truth of the facts recited as explanation of the state of mind of the declarant. Buckeye Powder Co. v. Du Pont de Nemours Powder Co., 248 U. S. 55, 39 S. Ct. 38, 63 L. Ed. 123. In the case at bar the reasons for the refusals to sell were a material issue, since the government sought to show them related to the conspiracy and the defendants claimed that the true reasons were entirely different. The appellants would have been entitled to an instruction limiting the probative force of the evidence to that issue—more specifically, warning the jury not to consider these statements as evidence of the truth of the matters asserted therein. But, since the appellants did not ask for such an instruction, but attempted rather to exclude the evidence entirely, they cannot now claim error in its admission. See Lauderdale County v. Kittel, 229 F. 593 (C. C. A. 5); Young v. Corrigan, 210 F. 442 (C. C. A. 6); Drew v. Drew, 250 Mass. 41, 144 N. E. 763; Jerolaman v. Town of Belleville, 90 N. J. Law, 206, 101 A. 244; 1 Wigmore, Evidence, § 12.

██ Complaint is also made of the admission of evidence of instances of interference with purely intrastate commerce. The indictment is for a conspiracy which undoubtedly included much which the Sherman Act did not cover, but it included also as a very substantial part the suppression of sales to the marketmen, and that was within the Sherman Act. To limit the government to instances of interstate interference would be to assume that there were two conspiracies, one interstate, the other intrastate. That was not what was charged, nor was it the fact. The prosecution was entitled to prove the conspiracy charged, and in so doing to prove intrastate interferences, both for their bearing on the object of the conspiracy and on the method of carrying it out. For instance, one could not connect the acts of the labor unions with the other defendants except by showing the general scope of the concert between them. If they acted in unison in intrastate instances, it was a fair inference that they so acted when they refused to load for marketmen at the terminals or at the market. The fact that, in proving the conspiracy in violation of the Sherman Act, it also appeared

that another crime under state law was committed is no valid ground for objection. See Johnston v. United States (C. C. A.) 22 F. (2d) 1, 5; Kaplan v. United States, 7 F. (2d) 594 (C. C. A. 2); Williamson v. United States, 207 U. S. 425, 451, 28 S. Ct. 163, 52 L. Ed. 278.

The argument is earnestly pressed that the indictment was drawn and the case was tried upon the theory that the continuous flow of interstate commerce continued until final disposition of the poultry by the retailers to the consumers; that by far the largest part of the evidence related to restraints of trade between marketmen and retailers, which the government now appears to concede to be intrastate business; and that, while some evidence of restraints on intrastate commerce was proper to show the scope of the conspiracy, the introduction of such a mass of testimony of this character without adequate explanation of its function to the jury was so prejudicial as to require reversal. To this argument we cannot yield. The jury was distinctly informed that to convict they must find an unreasonable restraint upon interstate commerce, and that to do this they must find that interstate transit ended only after sale by the receivers to the marketmen. If we are right in applying the rule of the stockyards cases to the facts at bar, we see no substance in the point under discussion.

Numerous errors are assigned to the charge, but none of them in our opinion is well founded. It is objected that the charge left to the jury the question of whether interstate commerce included the receivers' sales to the marketmen. True, the court should have charged that it did; but leaving it to the jury was an error against the prosecution not against the appellants. As to any failure to define more nicely what the wrong was, the defendants did not request anything along that line, and probably did not desire it. It would be clearly improper to go over the charge on that theory. We cannot condemn a charge for not being more specific, when no exceptions were taken. Rosenblatt v. United States, 271 F. 435 (C. C. A. 2). Nor can we see any fatal error in the refusal of requested charges. Whatever was essential in such requests was substantially covered by the charge as given.

The challenge to the indictment on the ground of duplicity is idle at this late date. It was first raised in the briefs, and the verdict cured all such objections. Durland v. United States, 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709.

Appellant Simon contends that he was not sufficiently connected with the conspiracy. His position as supervisor of the Chamber of Commerce, and its dominant officer, of itself made it most unlikely that he should not have been privy to the policy it adopted and its execution of such policy. But, aside from this, he was specifically connected. The credibility of the testimony was for the jury

Finding no substantial error in the record, we affirm the judgment.