AMERICAN COOPERATIVE SERUM ASS'N v. ANCHOR SERUM CO.

SAME v. ILLINOIS FARM BUREAU SERUM ASS'N.

Nos. 8563, 8564.

Circuit Court of Appeals, Seventh Circuit.

March 4, 1946.

Rehearing Denied April 3, 1946.

MAJOR, Circuit Judge, dissenting.

C. G. Myers, C. F. Snerly, and J. E. Loeb, all of Chicago, Ill., Ben Phillip, of St. Joseph, Mo., and Harry Meloy and Paul E. Mathias, both of Chicago, Ill. (Myers & Snerly and Kirkpatrick, Mathias & Meloy, all of Chicago, Ill., and Culver, Phillip, Kaufmann & Smith, of St. Joseph, Mo., of counsel), for appellants.

Francis X. Busch, James J. Magner, and Neal Huff, all of Chicago, Ill., for appellee.

Before SPARKS, MAJOR and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

By these actions plaintiff seeks to recover triple damages from defendants under the Federal anti-trust laws, for alleged violation of Title 15 U.S.C.A. § 13(a), (c), (d) and (f).

The court submitted the case to the jury for a special verdict upon whether the plaintiff was damaged as the proximate result of the defendant's violation of that section of the statute, and if so, the amount of such damage. The verdict was that plaintiff was not thus damaged.

At the close of plaintiff's evidence, each defendant moved for a directed verdict in its favor, which was denied. At the close of all the evidence the plaintiff and each defendant filed a separate motion for a directed verdict in its favor. These were overruled.

After verdict plaintiff filed a motion to set it aside, and alternatively for a judgment in its favor, non obstante veredicto, or for a new trial. This motion was sustained, and judgment for plaintiff was entered for triple damages in the sum of $17,666.10, plus an attorney fee of $2,500, upon a finding by the court that plaintiff had been damaged as a proximate result of the matters complained of in the sum of $5,888.70. Alternatively the court allowed the motion for a new trial in the event, upon appeal, the judgment entered should be reversed or set aside. Such procedure seems to be authorized by Rule 50(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Montgomery Ward and Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147.

The original complaint also sought to recover for loss of volume of plaintiff's business and for its deprivation of a fair opportunity to increase such volume. At the close of plaintiff's evidence, it, by the court's permission, filed an amended complaint which omitted those two claims, and the case went to the jury on the proof relating to the allegations with respect to plaintiff's damage proximately resulting from defendant's unlawful acts in selling its competitive products at rates lower than those published by it, as required by law.

Plaintiff is an Iowa Cooperative Association, organized for the purpose of manufacturing and selling to its own members biologics used in the prevention and treatment of hog cholera. It succeeded to the business of the American Serum Company, which assigned its business, good will, and a portion of the cause of action here involved, and ceased the manufacture and sale of serum.

The Anchor Serum Company, referred to as Anchor, is a Missouri corporation engaged in the manufacture and sale of serum. Defendant, Illinois Farm Bureau Serum Association, referred to as the Association, is a cooperative, incorporated under the Agricultural Cooperative Act of Illinois, 32 Ill.R.S.1945, sec. 440 et seq. Its members are county farm bureaus or county or state farm organizations whose membership is limited to Farm Bureau members. Its purpose is the dissemination of information relative to diseases of live stock and preventive biologics to be used in the treament of such diseases, and to act as agent for its members in collectively purchasing, handling and distributing such biologics and other supplies for its members.

Its stock consists of 1000 shares Class A preferred; 2500 Class B preferred; and 1000 common shares. The first and last classes, in approximately equal amounts of each, are owned by its membership, which consists of about 100 Farm Bureaus, or farm organizations located in the 102 counties of Illinois. The Class B preferred was issued to and owned by the Illinois Agricultural Association, in whose offices in Chicago, Serum Association merely has desk room. The sole purpose of the Serum Association, as stated in its charter and by-laws and in its contracts with the County Farm Bureaus, is to act as purchasing agent for all the County Farm Bureaus in Illinois. The relationship between the Association and its members, the Farm Bureaus, is set forth in that membership

agreement, which has been in force at all times herein referred to.

That agreement recited that the Association was a state-wide organization formed to provide a central purchasing or manufacturing service for anti-hog cholera serum and virus and other biologics; that the member bureau was desirous of obtaining such central purchasing or manufacturing service and that the Association agreed to act as such purchasing agent; that the County Farm Bureau appointed and constituted the Association as its sole and exclusive agent to bargain for, purchase or manufacture and provide such quantities of serum as such member might require; that the member agreed that it would not purchase serum through or from any other person or persons while that contract remained in force and effect; that the member would buy only from the manufacturer selected by the Association, pay for such serum promptly, and maintain uniform retail prices for serum and other biologics or supplies with other members of the Association, such prices to be determined by the Association; and that in the event that serum was sold by the member to persons not members of a Farm Bureau, then the amount of business done with all of such non-members during any such fiscal year should not exceed in value the amount of business done with members during the same period.

The production and distribution of this serum is regulated by the Federal Serum and Virus Act of 1913, 21 U.S.C.A. §§ 151–158; the Anti-Hog-Cholera Serum and Hog-Cholera Virus Act of 1935, 7 U.S. C.A. §§ 851–855; and the Marketing Agreement executed in December 1936, by and between handlers of serum, including Anchor, and the Secretary of Agriculture, pursuant to the last-named Act. This Agreement classified buyers of biologics as consumers, dealers, wholesalers, and volume contract purchasers, and provided for the appointment of a Control Agency to be composed of members of the industry to supervise operation of the Agreement. Plaintiff's president and Anchor's vice-president were original members of the Control Agency. The Agreement required each serum handler to file with the Secretary of Agriculture and the Agency a list of its selling prices to each class of buyers as defined by the Agreement and the Control Agency, including terms of sale and discounts, and it prohibited any sales un-

less such prices were so posted, and also prohibited any deviation from such posted prices. The Serum and Virus Act, 7 U.S. C.A. § 852, provided that the making of such agreement should not be held in violation of any of the anti-trust laws. Anchor and plaintiff each signed the Agreement and filed a list of its selling prices in compliance therewith.

The Control Agency defined a volume contract purchaser as one who had bought 15,000,000 cubic centimeters of the serum during the previous year, and in early 1937, the Association qualified as such by furnishing pertinent data to the Agency and was thereupon so bulletined to the trade.

Pursuant to the mandate of the Agreement, Anchor posted its prices for serum on December 14, 1936, as follows:

> To Consumers, 75¢ per 100 ccs,
> To Dealers, 63¢ per 100 ccs,
> To Wholesalers, 51¢ per 100 ccs,
> To Volume Contract Purchasers, 49¢ per 100 ccs.

The following legend appeared below its signature to its price list:

"We prepay forwarding charges. We also spend liberal allowances for advertising and sales promotion work."

A like price list was posted by Anchor in January 1938. On July 13, 1939, this list was changed by Anchor with respect to only the following category:

"Volume Contract Purchasers (where no local distribution is required) contracting for at least 35,000,000 ccs of serum and virus to be taken within a period of one year where no local distribution service is required—serum 36¢ per 100 ccs * * *."

The legend as to the allowances for advertising and sales promotion was omitted.

July 31, 1939, this posting was again changed by Anchor, reducing the price of serum to consumers, from 75¢ to 70¢; to dealers, from 63¢ to 57¢; to wholesalers, from 51¢ to 45¢; to volume contract purchasers, as follows:

> 15,000,000 ccs 42¢ per 100 ccs,
> 20,000,000 ccs 41¢ per 100 ccs,
> 25,000,000 ccs 40¢ per 100 ccs,
> 30,000,000 ccs 39¢ per 100 ccs,
> 34,000,000 ccs 38¢ per 100 ccs,
> 37,000,000 ccs 37¢ per 100 ccs,
> 40,000,000 ccs 36¢ per 100 ccs,

During the year 1936, Anchor made an oral agreement with the Association

whereby the latter might spend a certain amount of money for advertising, sales promotion and educational work for the period from December 1936 until July 1, 1937, for which the Association would receive from Anchor, 4¢ per 100 ccs on serum sold. From July 1, 1937, until March 25, 1938, that allowance was increased to 8¢; and from March 1938, until July 15, 1939, it was increased to 13¢.

All orders for serum were made by the several Farm Bureaus for their respective members, and the shipments were made directly by Anchor to the Farm Bureau ordering them. They were charged, however, to the defendant Association which paid for them and collected the amount from the Farm Bureau which gave the order, and it in turn collected it from the Farm Bureau member to whom the serum was finally delivered. The Farm Bureaus who purchased serum from the Association, were rebated by the latter, by cash or credit, out of the funds received by it from Anchor, which in turn were passed on by the Bureaus to their respective members by credit on their serum accounts, or otherwise, in proportion to the amount of serum purchased and received by them.

Anchor also had one wholesaler and several drugstore dealers to whom it sold its product in Illinois. The Association was the only volume contract purchaser with whom Anchor did any business before 1941. All serum thus sold by Anchor to the Association bore the label showing it to be processed and tested by Anchor and distributed by the Association, and gave the directions for its care and dosage. The Association had no refrigerating facilities for handling the serum from its own office.

With respect to the allowances for advertising, promotional and educational work, Association's books disclose that it received from Anchor by rebate in the way of credits or checks the following amounts in the several periods set forth, together with the actual amounts expended by the Association for said purposes during the same periods:

|  | 1937 | 1938 | 1-1-39 to 7-15-39 |
| --- | --- | --- | --- |
| Rebate | $8,666.83 | $39,044.30 | $32,188.35 |
| Expenditure | 648.53 | 611.77 | 3,527.24 |

It was plaintiff's theory, and the court sustained it, that the difference between the rebates and the actual expenditures for the purposes contemplated constituted unearned advertising and were allowances which amounted to secret rebates from Anchor to the Association, which were discriminative and violative of the statute.

Plaintiff's only posted price was 75¢ for sales to consumers. This was done on December 16, 1936. Its charter only authorized it to manufacture for and sell serum to its own members. In making these sales it acted through druggists who acted as warehousemen who received the serum on consignment. Sometimes, however, the shipments were made to the druggists c. o. d. The druggists held the serum for sale to plaintiff's members, who became such, by signing an application for membership and paying 25¢ for membership dues. These dues were not paid in cash but were deducted from the patronage dividends to which the purchasers became entitled as members. Blanks were furnished to the druggists, and when a farmer wished to purchase serum, he signed an application for it and also for membership, and left it with the druggist. The members received their share of a patronage dividend at the end of the appropriate fiscal year. This was the only method for plaintiff obtaining its members in Illinois, where it had 56 druggist-warehousemen in 1937, 49 in 1938, 46 in 1939, and 41 in 1940. By way of contrast defendants became the sellers of practically all serum in Illinois.

In January 1937, plaintiff received complaints from its druggist-warehousemen to the effect that they could not sell plaintiff's serum at 75¢ to its consumers because the County Farm Bureaus who were members of Serum Association were selling the Anchor serum to consumers at 65¢. Thereupon, plaintiff instructed its warehousemen to reduce its consumer price in order to meet that competition. Plaintiff did not reduce its price throughout the state but only in those areas where it was necessary to meet the Farm Bureau competition in order to prevent the destruction of its Illinois business. In some places in Illinois it was able to and did sell the serum at 75¢ because in those areas plaintiff's warehouseman was located where there was no Farm Bureau office or, if there were one, its sales organization was ineffective. A recovery is sought for the sales where plaintiff was compelled to sell its product,

as it alleged and testified, at 65¢ instead of 75¢ by reason of the defendant's competition in violation of its marketing agreement.

Defendants contend that the court erred in permitting plaintiff's witnesses to testify as to the reasons given to the plaintiff by their druggists why the latter could not sell plaintiff's serum at 75¢, which resulted in plaintiff's reduction in price. They urge that such evidence is hearsay, self-serving and thus incompetent. This was not error. Such evidence is an exception to the hearsay rule and is well recognized. Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341; Wigmore on Evidence, 3d Ed., Vol. 6, sec. 1729; Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 47 F.2d 156; Kimm v. Steketee, 48 Mich. 322, 12 N.W. 177; Hubbard v. Allyn, 200 Mass. 166, 86 N.E. 356; Brannen v. Bouley, 272 Mass. 67, 172 N.E. 104.

It is further contended that the evidence does not disclose that the defendants' price cutting was the cause of plaintiff's inability to sell its product. We can conceive of no fact which would more surely cause such inability than a cut in price by one's competitor. Here the parties stipulate that the serum produced by plaintiff and Anchor was of like grade and quality. Under these circumstances, coupled with the facts that the defendants did indirectly cut their prices, regardless of the Marketing Agreement, a prima facie case was made and plaintiff was not required in the first instance to prove the absence of all other conceivable causes. Under this statute when a prima facie case is made, the burden shifts to the defendant, if it can do so, to show that the damage, if any, was otherwise caused. 15 U.S.C.A. § 13(b).

It is further claimed by the defendants that they are exempt from the operations of the Anti-Trust Laws because of the immunity created under the Anti-Hog-Cholera Serum and Virus Act, 7 U.S.C.A. § 852. We think this is not a correct interpretation of that section. It is clear that the exemption only refers to the Marketing Agreement. A reading of the Act and its legislative history convinces us that Congress did not intend to authorize either party to the Marketing Agreement to violate its terms. Otherwise such Agreement would be ineffectual. See United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

Defendants further urge that plaintiff was guilty of unclean hands because it likewise violated the Act in cutting its prices in order to meet their competitive prices. "The rule that a complainant must come into equity with clean hands means that he must do equity as respects the defendant's rights in the particular matter of the suit. * * * If he is not guilty of inequitable conduct toward the defendant in that transaction, his hands are as clean as the court can require." Carpenters' Union v. Citizens Committee, 333 Ill. 225, 164 N.E. 393, 402, 63 A.L.R. 157.

Furthermore, 15 U.S.C.A. § 13(b) provides that the alleged inequitable conduct of plaintiff, here relied upon, is not a violation of that Act on the part of the plaintiff.

Moreover, on the theory of plaintiff's unclean hands, defendants unsuccessfully attempted to prove the manner in which plaintiff came to be organized under the laws of Iowa; how it acquired its property; the amount of its indebtedness and to whom it was owed. It seems to be well settled that if plaintiff did anything unlawful in connection with its organization or the administration of its financial affairs since that time, it can only be inquired into, in a quo warranto proceedings, by the State which granted its charter. Such matters are not permitted to be collaterally attacked. National Bank v. Matthews, 98 U.S. 621, 25 L.Ed. 188; Steckler v. Pennroad Corp., 3 Cir., 136 F.2d 197; Iowa Federation v. Dilley, 234 Iowa 417, 12 N.W.2d 815; Pittman v. Tobacco Growers Co-op. Assn., 187 N.C. 340, 121 S.E. 634.

Defendants further urge that the court erred in rejecting their plea that plaintiff cannot maintain this action because it is one to be asserted by plaintiff's members rather than by itself, because, as they say, any amount recovered in such action would not be the property of plaintiff but of its members. We think the court did not err in this respect. It seems clear that the amount recoverable in this action, if any, would have been in the first instance the property of the corporate entity, would have belonged to its treasury, and would have been subject to its corporate purposes and available for the payment of its creditors, if any; and that the individual members would acquire no right or in-

terest therein until in due course the action of plaintiff's board of directors had fixed the amount of the patronage dividend and there had been a separation of funds from the corporate treasury. The plaintiff is a corporate entity and we find no authority which prevents it from suing in its name on its contracts or for a violation thereof, notwithstanding the fact that a portion of the amount recovered, if any, would eventually go to and belong to its members. Kansas Wheat Growers Assn. v. Sedgwick County, 119 Kan. 877, 241 P. 466; California Canning Peach Growers v. Downey, 76 Calif.App. 1, 243 P. 679.

Defendants argue that it would be anomalous to grant immunity to the making of a contract and not extend the same immunity to the parties in performing it. That, of course, is true, but that is not the case here. Plaintiff's theory is that damage resulted to it, not from defendants' performance but from their lack of performance. It is fair to say, however, that, in this connection Anchor says that it sold its serum to Serum Association as a volume contract purchaser at the prices named in its posted price list and that the Control Agency approved those sales as did also the Secretary of Agriculture in the following manner. On July 25, 1939, the Control Agency filed a complaint with the Secretary of Agriculture objecting to Anchor's postings and filings, particularly that part of it which provided in effect that they spend liberal allowances for advertising, educational and promotional work. This complaint was in two paragraphs. On September 12, 1939, the Secretary replied to these complaints substantially in the following manner: With respect to the first complaint, he noted that it charged that certain items in Anchor's price list of July 13, 1939, were inequitable as measured by the regulation in effect December 7, 1936, and should be suspended. He said that Anchor had filed a price list on July 29, 1939, which superseded the price filing referred to by the Control Agency. With respect to the second complaint he further stated that it referred to Anchor's spending liberal allowances for advertising and sales promotion work; that Anchor had revised its price list in which it had withdrawn that provision. He further stated that since Anchor was permitted to operate for approximately two and one-half years under that provision without objection and that the same practice had been indulged

in by other members of the industry without complaint, he thought it was impractical to ask the courts to enjoin the practice or punish Anchor for indulging in it. He further called attention to the fact that Anchor had not done this secretly, but had published it in its list of prices, and when objection was offered by the Control Agency, it had eliminated it from its published price list. Under these circumstances the Secretary of Agriculture dismissed the complaints.

■ The District Court refused defendants' offer to introduce these facts in evidence, and exceptions were saved. We think the offer did not present matter material to the issue here. There the issue was first, whether Anchor's price list of July 13, 1939, was equitable as measured by its former price list which had been withdrawn; and second, whether its offer of liberal allowances was still objectionable after the Control Agency had acquiesced in it for over two years, and after it had been withdrawn. There was no question raised there as to whether there were rebates in excess of the amount actually used by the purchaser for advertising and promotional work, and Anchor had withdrawn the offer of such allowances when it found they were objectionable to the Control Agency. It was under these circumstances that the Secretary thought it was impractical to ask the courts to enjoin the practice or punish Anchor for indulging in it. Certainly the Secretary's letter cannot be construed as authorizing rebates which were not used for such purposes as published. It is quite doubtful whether the Secretary would have authority to do so even if such facts were before him.

■ In the facts before us, the rebates by Anchor to Serum Association were so greatly in excess of what the latter used for the purpose of advertising and promotion work that we feel compelled to agree with the District Court's holding that such rebates were merely for the purpose of reducing the purchase price to Serum Association and its members, which, in the absence of any other explanation, seems to be a clear violation of the statutes.

■ Anchor further urges that it was not in competition with plaintiff because plaintiff's sales in Illinois were to consumers, while Anchor's sales in Illinois were to a volume contract purchaser for which it had filed its selling price as required by the

Secretary's regulation. We think the arrangement here disclosed does not destroy the competitive relationship between Anchor and plaintiff. Anchor was selling its product directly to the agent of the Farm Bureaus who in turn were selling direct to their members who were consumers. The facts are that all but a small amount of these rebates to the Serum Association by Anchor were passed on to the Farm Bureaus who in turn, aside from their expenses, passed them on to the consumers. It is barely possible that Anchor did not know that any part of the rebates finally reached the consumers, but by the exercise of a very small amount of reasonable diligence they could have known it, and that in a very real sense a very harmful competition was established as against plaintiff in the disposition of its products. Moreover, Anchor's rebates to Serum Association were clearly in violation of the statute, and Anchor cannot avoid that liability by saying that it did not know Serum Association was using such rebates for unwarranted purposes. It would seem from this evidence that Anchor did not care for what purposes they were used. Evidently they asked for no information on the subject. It is quite evident that they could have easily ascertained the facts, for Serum Association's books showed all the facts.

Serum Association further contends that it did not know the prices at which Anchor was selling to its other customers. We cannot see that this would make any difference. The question here is whether Anchor violated its own published price list with respect to Serum Association. The District Court held that it did, and we think rightly so. It is possible that Anchor never dictated to Serum Association what price it should charge its members, or the price at which those members should sell to the consumers. However, it must have known that it was dealing with a cooperative which was acting as agent for the many Farm Bureaus who were its members, and that whatever Anchor paid to this cooperative in the way of rebates was in violation of the statute, and that such fund, less expenses, would eventually go to the Farm Bureaus, which in turn would be distributed to the consumers, thus in effect reducing the price which they had paid for their serum. The books of account of both defendants reflect this method of treatment of the allowances, and it is abundantly substantiated by the minutes and records of Serum Association.

The District Court based its judgment upon the evidence of a certified public accountant, who tabulated each of plaintiff's sales made in Illinois at 65¢ during the period from January 1, 1937, to March 27, 1940. He also calculated the amount of each item if it had been sold at 75¢ per 100 cc. The difference between these totals is the amount upon which the judgment is based. We think this is the correct method of computation. However, we are convinced that the total amount covers a longer period than that to which plaintiff is entitled. It is agreed that on March 27, 1940, all manufacturers of serum, including plaintiff and Anchor, posted the price to Volume Contract Purchasers at 36¢ per 100 cc, and no claim is here made for damages after that date. However, on July 13, 1939, Anchor abandoned its rebates and filed with the Secretary of Agriculture its amended price list to Volume Contract Purchasers at 36¢. Under the statute that rate became effective on July 16, 1939, and as we read the statute its validity did not depend upon others accepting it. True, the Secretary of Agriculture could refuse to accept it if he so desired and thus defer its effectiveness for further examination. However, the Secretary did not refuse to accept it, but he recognized it as valid and he referred to its validity in his ruling in the Control Agency's complaint above referred to. Plaintiff, however, urges that inasmuch as Anchor's price of 36¢ had originated in and pursuant to its former illicit practice that had brought about the discriminatory price, the defendants should be held liable for the entire amount up until March 27, 1940. We do not agree with that conclusion. In other words, we think plaintiff is not entitled to recover for any alleged damage after July 15, 1939.

We think the uncontradicted evidence discloses damage to plaintiff, and the jury should have so found. Indeed, the District Court would have been warranted in sustaining plaintiff's motion for a directed verdict at the close of all the evidence for actual damage sustained in the sum of $4,449.31 upon which a judgment should have been rendered for $13,347.93. The former amount represents the uncontradicted amount of damage to plaintiff during the period from and including January 1, 1937, to July 16, 1939. After verdict the

District Court was of the same opinion, and accomplished the correct result, except as to the amount. In so doing we think there was no error, nor was there a violation of defendants' right of trial by jury. As to $13,347.93 of the verdict we affirm. As to the remainder we reverse and remand for further proceedings not inconsistent with this opinion.

MAJOR, Circuit Judge (dissenting).

I think this judgment should be reversed upon two grounds: (1) the evidence upon which plaintiff relies as proof of damage was erroneously admitted, and (2) even though such evidence was properly admitted, it was insufficient to establish damage as a matter of law but at most presented an issue of fact for the jury's determination.

It must be kept in mind that the only issue submitted to the jury was whether plaintiff was required or compelled to reduce the price of its serum in order to meet the unfair competition occasioned by the alleged unlawful conduct of the defendants. In other words, plaintiff's position in this respect rests solely upon the basis that it was required or compelled to make such reduction and these reductions represent the amount of plaintiff's damages as embodied in the judgment.

As pointed out by the majority, plaintiff's serum was sold to its members through druggists who acted as plaintiff's warehousemen and who usually received the serum on consignment. In other words, the drugstores were acting as plaintiff's agents in making such sales.

The only testimony offered by plaintiff as the basis for its right to recover damages is that of its president, Huff, and its assistant sales manager, Davis. Neither of these witnesses had anything to do with or any contact with plaintiff's customers. The latter, in making purchases, dealt directly with the drugstores acting as plaintiff's agents. The testimony of Huff and Davis upon which plaintiff relies was offered and admitted solely as basic proof that plaintiff was required or compelled to reduce the selling price of its serum, and as a result thereof sustained the damage complained of. No other proof was offered on this phase of the case. This testimony is related by the majority and need not be repeated. Reduced to its naked form, it is that the witnesses (Huff and Davis) received complaints from druggists that they could not sell plaintiff's serum at 75¢ in

competition with the Farm Bureaus who were selling at 65¢. Upon such complaint being made, plaintiff ordered its druggists to reduce the price to 65¢.

The opinion states: "Defendants contend that the court erred in permitting plaintiff's witnesses to testify as to the reasons given to the plaintiff by their druggists why the latter could not sell plaintiff's serum at 75¢, which resulted in plaintiff's reduction in price. They urge that such evidence is hearsay, self-serving and thus incompetent. This was not error. Such evidence is an exception to the hearsay rule and is well recognized." A number of authorities are cited in support of this conclusion.

In my opinion, the conclusion is erroneous and the authorities cited do not support it. The first and most relied upon case is that of Lawlor v. Loewe, 235 U.S. 522, 536 35 S.Ct. 170, 173, 59 L.Ed. 341, where the court stated: "The reasons given by customers for ceasing to deal with sellers of the Loewe hats, including letters from dealers to Loewe & Co., were admissible."

The opinion does not disclose the exact nature of this testimony. It apparently is confined to statements by customers, and includes dealers in such category. Neither does the opinion indicate the purpose for which this testimony was admitted. Evidently, however, it was not for the purpose of proving a basis for plaintiff's right to recover. This view is fortified by a subsequent decision of the Supreme Court (written by the same Justice) in Buckeye Powder Co. v. E. I. DuPont De Nemours Powder Co. et al., 248 U.S. 55, at page 65, 39 S.Ct. 38, 40, 63 L.Ed. 123, wherein the court stated: "Several exceptions were taken to the exclusion of statements by third persons of their reasons for refusing or ceasing to do business with the plaintiff. * * * But the exclusion in this instance was proper. The statement was wanted not as evidence of the motives of the speakers but as evidence of the facts recited as furnishing the motives. Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341 * * *."

Taking these two cases together, it appears that a witness may testify as to the reasons assigned by a customer for refusing or ceasing to do business with the plaintiff. It is admissible, however, only for the purpose of showing the customer's motive and not as proof of a basis for recovery. As I understand, Wigmore on

Evidence, 3d Ed., Vol. 6, Par. 1729(2), makes a similar distinction.

In Greater New York Live Poultry Chamber of Commerce et al. v. United States, 2 Cir., 47 F.2d 156, 159, objection was made to the "admission over objection of the testimony of witnesses for the prosecution as to reasons given by receivers for their refusal to sell to recalcitrant marketmen." The court stated: "Such statements of reasons, though hearsay, are admissible to prove the state of mind of the declarant if that be in issue." (Citing the Lawlor case, supra.) The court went on to point out that the defendants would have been entitled to an instruction, specifically "warning the jury not to consider these statements as evidence of the truth of the matters asserted therein." The court further held that because the defendants had not requested such an instruction, they were not in a position to complain. Other cases cited by the majority are Hubbard v. Allyn, 200 Mass. 166, 86 N.E. 356, and Brannen v. Bouley et al., 272 Mass. 67, 172 N.E. 104, in each of which the court held admissible the reasons given by customers for refusing to buy from or deal with the plaintiff. In the Hubbard case, after so holding, the court pertinently points out (page 174 of 200 Mass., page 360 of 86 N.E.): "It was not necessary for the plaintiff to show, as a part of his case, the names of the customers. This was a proper subject for cross-examination, and it does not appear that the defendant was deprived of his rights in this respect."

The Illinois Supreme Court, in The Carpenters' Union v. The Citizens Committee, 333 Ill. 225, 164 N.E. 393, 63 A.L.R. 157 (not cited by the majority), similarly interprets the rule as to when and the purpose for which hearsay evidence is admissible. The court (page 256 of 333 Ill., page 404 of 164 N.E.) stated: "This testimony was clearly competent for the purpose of showing the motive of the employer's action. (Citing cases, including the Lawlor case, supra.) The testimony did not prove that the bankers would hold up the loan of the employer, or that representatives of the Citizens' Committee had demanded that their men be put on the job * * *. It did show the state of mind and motive of the different employers in discharging their employees and it was competent to be received for that purpose, leaving the acts on which their fears were based to be proved by other evidence."

It should be kept in mind in the instant case that neither a druggist nor a customer was offered as a witness. If a druggist had been offered, I think under the rule announced in the authorities relied upon by the majority he could have testified as to the reasons assigned by customers as to why they ceased or refused to purchase plaintiff's product. Such testimony would have been proper for the limited purpose of showing the motive or the state of mind of the customer but not as proof of a right to recover. In that contingency, the defendants, as pointed out by the Massachusetts court in Hubbard, supra, would have had an opportunity to cross-examine the witness as to what customers had refused to buy, their reasons therefor and other relevant factors concerning such refusal. There is no reason apparent from the record why plaintiff could not have shown by its druggists why it was necessary, if such be the fact, that its serum price be reduced. Defendants were entitled to cross-examine such witnesses and it would appear to constitute a very fertile field in this respect.

Moreover, the so-called hearsay testimony admitted amounted to nothing more than the opinion or conclusion of plaintiff's druggists that a reduction in price was necessary. This was testimony of a self-serving opinion made by the druggists who naturally were interested in obtaining permission from plaintiff to sell the latter's serum at the lower price. Moreover, the effect of the testimony is that the druggist was of the opinion that it was necessary to reduce the price because of information received from customers that they otherwise would not purchase. The testimony considered in this light is not merely hearsay but is hearsay heaped upon hearsay.

So, in my opinion, the evidence complained of was no exception to the hearsay rule, was perhaps inadmissible for any purpose and certainly not for that for which it was offered. If my view in this respect is correct, there should have been a directed verdict for the defendants, because admittedly there was no other testimony which would afford any basis for recovery. True, plaintiff offered in evidence its books and accounts for the purpose of showing the amount of damages allegedly sustained but such books merely reflect the situation based upon the contention that plaintiff was compelled to reduce its price. They

of course furnish no support for this basic contention.

Assuming that the view thus expressed as to the admissibility of this testimony is erroneous, I still think the judgment should be reversed. This is so for the reason that plaintiff's assertion that it was required or compelled to reduce its price in order to meet Farm Bureau competition presented an issue of fact for jury determination. In fact, this was the sole issue submitted to the jury. Predicated upon this issue, the court submitted two questions to be answered by the jury, namely, (1) was the plaintiff damaged as the result of the defendants' violation of the Robinson-Patman Act? and (2) if so, in what amount was the plaintiff so damaged? The jury answered the first question in the negative, which left it unnecessary for it to consider the second question.

Thereafter, the trial court sustained the plaintiff's motion for judgment notwithstanding the verdict, assessed plaintiff's damages and entered the judgment in dispute. I suppose that the court set aside the jury verdict on the theory that no question of fact was involved, in other words, that plaintiff had established its right to recover as a matter of law. The majority of this court, in approving the action of the court below, apparently are of the same view; in fact, it is stated in the opinion that the court would have been justified in directing a verdict for the plaintiff.

In my view, a consideration of plaintiff's testimony alone presents a jury question on the vital issue as to whether plaintiff was required or compelled to reduce its price. Accepting it at its face value, it carries little probative weight. As already pointed out, it is based solely on the hearsay testimony coming from plaintiff's druggists who naturally were interested in obtaining permission from plaintiff to sell serum at the reduced price. It was a self-serving statement on their part. As admitted by plaintiff's witness Huff on cross-examination: "I wouldn't say they (the druggists) quit us cold and took you (the Farm Bureaus) on, but I know that was one of the arguments to get this price of ours down." Huff also admitted that there were fifteen drugstores in fifteen different counties in Illinois in which the Farm Bureau was also located, where no reduction in price was made. In six of these counties, the Farm Bureau had offices in the same town with plaintiff's druggists. He also admitted that the Farm Bureau had no office or representative in twelve of the thirty-six towns where plaintiff reduced its price. On direct examination Huff testified that plaintiff had not reduced its price in any state other than Illinois. He later admitted, however, that the price was reduced at three different towns in Iowa, in the same manner as it had been in Illinois. Admittedly, it had no competition from the Farm Bureau or the defendants in Iowa.

He also admitted that when the price was once reduced it was never increased, irrespective of any changed circumstances, and that there were other factors which entered into the matter of a reduced price. For instance, it was not required to reduce its price in some towns where it was met with Farm Bureau competition because plaintiff's druggists were better salesmen than those of the Farm Bureau or that the latter were not active in pushing the sale of its serum. Without going into further detail, it is sufficient to observe that the testimony of both Huff and Davis is in many respects inconsistent with the assertion that plaintiff was required or compelled to reduce the price of its serum. In my opinion, a trier of the facts was not bound to accept as conclusive the hearsay and opinionated evidence of these witnesses that plaintiff was so compelled. If their testimony presented no issue of fact for a jury on this vital issue and a court was bound to accept it as a matter of law, it would appear that plaintiff's decision on this issue was final.

Other factors exist which strengthen my conviction that a jury question was involved. I refer particularly to circumstances having to do with the form of plaintiff's organization as compared to that of the Farm Bureaus and the special character of competition, if any, which existed between them. Huff testified in effect that plaintiff did not look to members of the Farm Bureau for customers but was only interested in preserving its own customers, evidently referring to non-Farm Bureau members. Plaintiff, while terming itself a cooperative association, is in reality a pseudo-association possessed of none of the essential characteristics of such an organization. Its so-called membership is illusory. Any person, farmer or otherwise, becomes a member at the time and only at the time of a purchase of plaintiff's serum. Such so-called membership fee is

25¢, and even this amount is not actually paid.

In contrast, the county Farm Bureaus in connection with their parent body, the Illinois Agricultural Association, are genuine, bona fide cooperative organizations actually engaged in business not for profit but for the benefit of their members through a multiplicity of services rendered. Only those actually engaged or interested in agriculture are eligible for membership, which may be acquired upon application and the payment in advance of an annual fee of $15. Upon the failure of a member to make such payment annually thereafter, his membership is canceled. The dealings of the Farm Bureaus, including the sale of serum, are solely with its members.[1] Thus the sale of serum made through the various Farm Bureaus was to a select and limited class of persons, that is, to those who were members. On the other hand, plaintiff's customers were found among the public at large, with no restriction of any kind on the right of any person to purchase its serum.

Assuming that plaintiff in the sale of its serum was in competition with the Farm Bureaus, to hold that it was as a matter of law required or compelled to reduce its price is to ignore the realities of the situation.

To illustrate, suppose that a person desirous of purchasing serum goes to one of plaintiff's agents for such purpose. Of course, he is not likely to be a member of the Farm Bureau for that class of customers are not sought by plaintiff and, furthermore, there would be no occasion for a Farm Bureau member seeking to purchase from plaintiff. The prospective customer is told that the price of plaintiff's serum is 75¢. Is plaintiff required to reduce its price to 65¢ in order to sell because a member of the Farm Bureau can purchase for 65¢ from the organization of which he is a member? A negative answer to this question appears reasonable from the very nature of the situation. This is so for the reason that the Farm Bureau will not sell to plaintiff's prospective customer. He can do one of three things in so far as the parties to this suit are concerned: (1) purchase from the plaintiff at its price, (2) pay $15 for a membership in the Farm Bureau and thus qualify to purchase its

serum, or (3) do without serum. It is not reasonable to think that he would pay the fee necessary to join the Farm Bureau for the purpose of saving a few cents or dollars on a purchase of serum, and it is just as unreasonable to think that a person in need of serum would do without it because of plaintiff's price.

To illustrate further, A is desirous of purchasing a cow. Farmer B has one for sale, priced at $75, which he is willing to sell to anybody. Farmer C also has for sale one of equal quality, priced at $65, which he is willing to sell only to members of a designated organization. A is not a member of such organization. Is B compelled to reduce his price in order to meet that of C? If a court was called upon to answer this question as a matter of law, I think it would be upon safer ground to answer it in the negative. Assuming, however, that the question is an arguable one as it perhaps is, it would appear to me to present an issue of fact. Of course, whether B sold his cow to A for $75 might depend upon many factors, including his experience in selling cows (some of these farmers are mighty good cow salesmen) and upon how badly A was in need of a cow. Also, the fact that C's cow was lower priced might afford A grounds for arguing with B that the price of his cow was too high, just as the Farm Bureau price of serum might afford the prospective customer of plaintiff an argument by which he could persuade plaintiff to reduce its price. Whatever potentialities such an argument might possess, it would not compel B as a matter of law to reduce the price of his cow any more than it would compel plaintiff to reduce that of his serum.

I think the court properly submitted to the jury the issue as to whether plaintiff was required or compelled to reduce the price of its serum. The question having been properly submitted, the jury's answer thereto should have been accepted. It follows, in my view, that the court's action in entering a judgment, notwithstanding the verdict, was erroneous and that it should be reversed. It would seem to follow under Rule 50(b), Federal Rules of Civil Procedure, as construed in Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147, that a new trial would result from such reversal.

---

[1] The record discloses that about 2% of the sales of serum by the Farm Bureaus was to persons other than members. This was the result, however, of errors on the part of office employees.