## UNITED STATES v. POPPA.

## UNITED STATES v. SKIRVIN.

### Nos. 10343, 10344.

United States Court of Appeals,
Seventh Circuit.

June 21, 1951.

As Amended on Denial of Rehearing
July 19, 1951.

B. Howard Caughran, Indianapolis, Ind., for appellants.

Matthew E. Welsh, U. S. Atty., Indianapolis, Ind., Marshall E. Hanley, Asst. U. S. Atty., Maurice W. Graston, Asst. U. S. Atty., Indianapolis, Ind., for appellee.

Before KERNER, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

In these two appeals, defendants Poppa and Skirvin seek to reverse judgments of conviction upon an indictment in four counts. The first charged defendants with conspiracy in violation of 18 U.S.C. § 371, to pretend falsely that Skirvin was an employee of the Bureau of Internal Revenue and thereby to defraud one Murphy and the United States by obtaining from Murphy the sum of $17,000, more or less, as falsely pretended delinquent income taxes. Counts 2, 3 and 4 charged Skirvin with substantive offenses under the False Pretense Statute, 18 U.S.C. § 912, and averred that Poppa aided and abetted him in the commission of each of those offenses. The jury having found defendants guilty upon all counts, the court sentenced Skirvin to consecutive terms of imprisonment aggregating 4½ years, and Poppa to similar terms aggregating 5 years.

Upon appeal each defendant urges reversal because, as they say, (1), the defendants were allegedly illegally arrested, (2), the evidence was insufficient to support the verdict against either defendant under any count and, (3), Count 3 was duplicitous and, therefore, insufficient to support a conviction.

Certain material facts are undisputed. One Charles Murphy, of Bloomington, Indiana, engaged in an extensive machinery business, had employed Poppa, a former employee of the Treasury Department, to prepare his income tax returns for each of the years 1946, 1947, 1948 and 1949. In

1950 Murphy had in safety deposit boxes, some $18,000 in cash. On March 18 of that year, Murphy received a telephone call from Skirvin, using the name of Hauser, in which Skirvin said that he was a revenue agent and desired to check certain tax returns of Murphy and all existing supporting evidence therefor. Murphy then called Poppa, advised him that a revenue agent was coming to Murphy's home and asked Poppa to come likewise. Shortly after Poppa reached the house, Skirvin arrived. Mrs. Murphy met him at the door and took him to the room where Poppa and Murphy were and where the three men then had a conference. Skirvin, though well known to and associated with Poppa, was introduced as Hauser. Eventually, as a result of the negotiations, Murphy obtained $4000 from safety deposit boxes in two Bloomington banks and gave to Poppa $3960, retaining $40. The two then met Skirvin, to whom Poppa, in Murphy's presence, passed the money. The two defendants then departed.

About the same time Harris, a legitimate deputy collector of Internal Revenue, having heard rumors of extensive earnings upon the part of Murphy, requisitioned the latter's income tax reports for 1946, 1947 and 1948. Mr. Harris, failing to reach Murphy, talked to the latter's wife, telling her that he wanted to check her husband's tax returns. As Murphy was at that time in the hospital, Mrs. Murphy suggested that Harris take the matter up with Poppa, Murphy's tax consultant.

Murphy remained in the hospital from March 27 to May 13. On April 19, 1950, Poppa visited him there, reported to him that Hauser had advised him, Poppa, that an audit was to be made of Murphy's tax returns and suggested that it would be wise for Murphy to obtain from his safety deposit boxes the remainder of his cash funds. Murphy's brother Frank got from the two safety deposit boxes the sum of $13,560 and this, at Charles' request, he turned over to Poppa. Poppa then got in contact with Skirvin and the two called on Charles Murphy at the hospital. There Poppa delivered the $13,560 to Murphy who

returned it to Poppa who then put it in his brief case which he handed to Skirvin. Both then left the hospital. In July, when the duly authorized deputy collector Harris examined the safety deposit boxes, he found in one, $170, and in the other, $270.

After Murphy came home from the hospital on May 23, he called the Bureau of Internal Revenue at Terre Haute, and asked for Hauser but was told no such person was employed by the Bureau in that city. On June 17, he wrote the collector at Indianapolis, requesting a list of amounts paid and credits listed on income tax returns filed by him for the years 1947, 1948 and 1949. On June 30, he again wrote the revenue authorities at Indianapolis, asking whether they had had a man by the name of Hauser working in the Bloomington territory in March and April, 1950. On July 4, he wrote a third letter, in which he made mention of the $3940 payment to a person who had represented himself as a deputy collector by the name of Hauser. Murphy also asked Harris whether he, Murphy, had been credited with a $4000 tax payment which he said he had paid to Hauser as a revenue employee, for taxes. As a result of these communications, the F.B.I. instituted an investigation resulting eventually in the arrest of both defendants.

There is no controversy as to the foregoing facts. The defendants do not deny that Skirvin was not a governmental employee or that they obtained the respective sums delivered by Murphy. The question before the jury was whether this money was paid to defendants in pursuance of a conspiracy upon their part to defraud Murphy by pretending that Skirvin was a revenue agent who was collecting back taxes from Murphy. This was Murphy's story. He recited in full detail his conversation with Poppa, Skirvin's impersonation of a revenue agent, the resulting meetings and the payments of the sums of money, as he said, to Skirvin as a revenue representative.

██ Defendants, however, sharply controverted Murphy's story. Though admitting the impersonation of a revenue agent by Hauser and receipt of the money from

Murphy, they assert that they received it as a part of a scheme on Murphy's part to get his cash out of the safety deposit boxes without his wife knowing it, and that they received part of it as a fee for their participation in Murphy's scheme, part of it for safe keeping and none of it in payment of taxes. They admit that after receiving the money, they wasted it in gambling losses and other expenditures. If their recital of the transaction is correct, of course, defendants are not guilty. If Murphy told the truth, they are guilty. The determination of this issue involved solely a question of fact, of creditability of the witnesses, and was, therefore, obviously, properly submitted to the jury.

■ Defendants urge that Murphy was an alcoholic and unworthy of belief, but even if this were true it does not justify this court, in reviewing the jury's verdict, in saying, as a matter of law, that he was wholly unworthy of credit. The jury knew from his own testimony, Murphy's weakness of character; it knew also from the testimony of defendants, their weaknesses and Skirvin's admitted pretension of being something which he was not. Whether Murphy's extended testimony was to be believed, in view of all the uncontroverted evidence and the circumstances involved, was a question solely for the jury. It should not be necessary to reiterate, or cite authority for, the proposition that courts of review do not weigh the evidence or determine the creditability of witnesses. Whether Murphy's story was incredible or that of defendants' so preposterous as to defy belief were questions not for us but for the jury.

Defendants urge that their original arrest was illegal and that the illegality, therefore, in some wise not exactly clear to us, invalidated the judgments. They rely upon United States v. Coplon, 2 Cir., 185 F.2d 629, wherein the court reversed the conviction because the trial court had admitted in evidence certain documents seized at the time of Coplon's arrest without a warrant. The question of legality of the arrest became material only because of the admission of evidence illegally obtained as a result of and at the time of such arrest. It was not the improper arrest but the reception of evidence illegally obtained as an incident of the arrest which necessitated reversal. Obviously the decision is not in point here, for there is no claim that defendants' allegedly illegal arrest resulted in the government's obtaining any evidence offered at the trial. True, defendants were arrested without a warrant and held until complaints were issued against them and then placed under bond. If at that time, they were illegally detained, the legality of their arrest could have been tested in proper proceedings; but no objection to their detention by the government was made by either of them. Later they were indicted and rearrested. This indictment having been dismissed, upon motion, the present indictment was returned, and, upon it, Skirvin was again arrested while Poppa voluntarily entered his appearance. So, whatever the circumstances of the original detention, there can be no question as to the legality of the custody of defendants upon proper process and entry of appearance in pursuance of the indictment upon which they were tried. They say they were prejudiced because, at the time of the original arrest, they denied receiving the money. It is impossible that this fact could have affected in any way the legality of their conviction, even though they later admitted receiving the money. Indeed, it was entirely proper that the jury, in passing upon credibility, consider any and all contradictory statements made by defendants.

■ It is said that the third count is duplicitous in that it charged defendants with having not only demanded but also with having obtained $3940 by impersonation of a federal officer. No objection to the sufficiency of the count was made until after the verdict had been returned. If the count was duplicitous, the defect could have been easily remedied by striking one of the words as surplus. But no such relief was sought. As a matter of fact the count differed from the other counts only in that it included the words "also ob-

tained". Such defects are cured by verdict. Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 47 F.2d 156; Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709.

We have considered carefully all of the suggestions of appellants. We find no erroneous action upon the part of the District Court.

The judgment is affirmed.