MARIO E. DÁVILA ET AL., Petitioners, *v.* SECRETARY OF STATE OF PUERTO RICO, Respondent.

No. 520. Submitted August 3, 1960.—Decided August 4, 1960.

---

*Francisco Ponsa Feliú* and *Alvaro R. Calderón, Jr.* for petitioners. *J. B. Fernández Badillo, Attorney General,* and *Arturo Estrella, Assistant Attorney General,* for respondent.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

In this petition for mandamus filed on July 22, 1960, the petitioners, Mario E. Dávila and Eduardo Flores, appeared as plaintiffs, alleging to be organizers and temporary President and Secretary, respectively, of the Christian Action Party which was in process of registration for the elections held November 8, 1960. They stated that they had tried to register certain electoral precincts, among them that of Culebra, including among the number of sworn petitions a number of petitions signed by the voters registered in the last registration held on January 30 and 31, 1960, voters who had not voted in the 1956 election, and that the Department of State had informed them that they would reject and shall subsequently reject all the petitions for registration signed by voters registered on said dates and who had not voted in 1956 on the ground that those persons were not qualified voters pursuant to the provisions of § 37 of the Election Law. The petitioners alleged that this attitude assumed by the Secretary of State had no support or basis on any legal provision, it being an unjust, illegal and unreasonable interpretation of the law, as § 37 of the Election Law provides that each and every person who signs a petition for the nomination of a candidate for office, shall state that he is a duly registered voter and that he is qualified to vote.

The Secretary of State answered denying that the petitioners were the organizers, temporary President and Secretary of the Christian Action Party, although he later admitted that the plaintiffs' witnesses would testify that they were duly appointed as such, and accepted that a number of voters registered in the last registration held January 30

and 31, 1960 had filed, in some precincts, candidate petitions under the name of Christian Action Party for their registration in the precincts in which they were to vote; and he also accepted that his Department had made it clear to the petitioners that it would not compute for the purpose of candidate registration, the petitions signed by voters registered in the 1960 registration, although he alleged that in no precinct the registration of any candidate for said party had been "officially" denied. He maintained that his interpretation to the provisions of § 37 of the Election Law in the sense that he is not bound to accept petitions signed by voters registered in that same year was absolutely reasonable and was the only interpretation compatible with the electoral machinery created by the other provisions of the Election Law and the Registration Act.

By way of dismissal, the Secretary of State alleged (*a*) that the action should be dismissed for want of proper parties; (*b*) the action tends to dilucidate a matter which was academic at that moment; (*c*) if the defects stated in (*a*) and (*b*) did not exist, the action was premature. The Court held a hearing and the parties introduced documentary and oral evidence. On August 4, 1960 the case was decided and we rendered the following judgment:

"On the basis of the evidence received and for the reasons that will be timely expressed in an opinion, the Court denies the motion to dismiss filed by the defendant and orders the Secretary of State to accept and take into consideration in the computation required for the registration of the Christian Action Party the sworn petitions for registration signed by the voters registered on January 30 and 31 of 1960."

The first ground for the dismissal which we denied, raised the question of want of proper parties. Mario E. Dávila and Eduardo Flores sued as organizers and temporary President and Secretary of the Christian Action Party, in process of registration. Section 37 of the Election

Law, as amended on September 2, 1955—16 L.P.R.A. § 112—provides the following insofar as pertinent:

"Candidates may be nominated by petition for any office in the following manner:

"A petition shall be filed with the Secretary of State of Puerto Rico setting forth the names of candidates nominated in the same, the places of residence of such candidates, and the offices for which they are respectively nominated.

"In each such petition there shall be set forth the name of the party which the petitioners represent and there shall be designated therein some simple device or emblem under which the name of such party's candidate shall be printed on the election ballots . . .

". . . It shall not be necessary to file a separate affidavit for each person who signs a petition for his nomination, but each such petition must state clearly the names of the candidates for whose nominations each petitioner petitions and the offices for which he desires to have such persons respectively nominated.

"In cases in which a petition nominates a candidate or candidates to be voted for in more than one precinct or municipality, and also candidates for offices to be voted for in only one precinct or municipality, it shall not be necessary to present separate petitions for such candidate or candidates, but the names of all such candidates may appear in a petition for each precinct or municipality in the district in which such candidate or candidates must be voted for, and the total number of such petitioners in petitions by precincts or municipalities shall be counted for the candidate or candidates for such district, which shall include a candidate nominated for the office of Governor of Puerto Rico."

The plaintiffs' *Exhibit 1*, was admitted in evidence which consisted of a printed form entitled "Application for Registration of the Christian Action Party and of its Candidates for the General Elections of 1960, Precinct of Aguas Buenas, Puerto Rico," which, as stipulated by the parties, was identical in its printed contents to all aplications filed up to that time in the Department of State, except as to a number of petitions in which the printed part stating that the petitioner

had voted in the elections of 1956 had been stricken out or omitted.

In regards to the matter now before us, the petitioner voter states in the printed form the following:

"I appoint as members of the Central Directing Body of the aforesaid mentioned party, the following persons: Mr. Mario Dávila, Chairman; Juan Arbona del Valle, Vice-chairman; Mr. Eduardo Flores, Secretary; Mr. Gilberto González Seijo, Treasurer; Miss Consuelo Delgado, Auditor.

"I appoint this Central Directing Body as my representative for all legal purposes under the Election Law of Puerto Rico, authorizing it to do whatever is necessary on my behalf for directing the party and to appoint and notify you the substitutes of any of the candidates listed below, in case of resignation, death or any other motive, by which any said candidate ceases to be such candidate, and I authorize said Central Directing Body to make any change or substitution in the name or emblem of said party and to decide any matter related with said party or with said candidates, authorizing it, also, to represent me before the Government or public officials, for all purposes pertinent to the Election Law. I appoint said Central Directing Body, the supreme authority of said party, and proof of its agreements will be brought before you, and the Government's Bodies and public officials, by means of certification signed by the Chairman and Secretary."

In support of his contention that the petition should be dismissed because it was fatally defective for want of proper parties, counsel for the Secretary argued at the oral hearing that pursuant to Rule 15.1 of Civil Procedure every action should be filed in the name of the party really interested; that up to that time there was no party by petition because there were not sufficient applications accumulated in ¾ of the electoral precincts and for 10 per cent of the total votes cast for Governor in the past election; that there merely existed preliminary steps for the registration of specific precincts in which the petitioners had served as intermediaries, without there actually existing up to that time

a Christian Action Party or a central directing body with legal life, therefore, that if any complaint existed against the action of the Secretary, it rather corresponded to the petitioner voters themselves or to the nominated candidates, and that the plaintiffs could sue if the question involved was their own nominations in the precinct in which they were voters, if their candidates were not accepted. Let us examine the situation.

Section 14 of the Election Law provides that political parties shall be the principal parties and the parties by petition, describing the principal parties as those whose candidate for Governor received in the last immediately preceding elections a number of votes equivalent to 10 per cent or more of the total votes cast in said last immediately preceding general elections by all parties for all candidates for Governor of Puerto Rico; and describing as those by petition as any political party which, in accordance with § 112 of the law, registers in the Department of State for the immediately following election, candidates by petition in and for ¾ parts or more of the electoral precincts throughout the Commonwealth and which files in said Department for said elections, petitions for the nomination of candidates signed by a number of petitioners equivalent to 10 per cent or more of votes cast for all the candidates to the office of Governor of Puerto Rico in the last immediately preceding general elections.

What is a political party? Cabanellas in his *Diccionario de Derecho Usual*, Vol. III (1954), defines them as follows:

"An association which pursues the government or control of the State with ideas or a more or less definite and loyal program to promote that end. To Bluntschli, political parties are 'social groups freely organized, in which certain beliefs or tendencies unite their members for a common political action.' To Burke, a 'body of men united for promoting by their joint endeavor the national interest upon some particular principle in which they are all agreed'."

Professor Bruce, in his book American Parties and Politics, 3d ed., considers Edmund Burke's definition as the classic definition of the political party. And quotes from Professor McLaughlin: "The establishment of so-called popular government brought parties. . . . We cannot conceive of the possibility of getting on without them; it is easier to imagine the demolition of any part of our constitutional organization, the submersion of a large part of what the Constitution describes, than to imagine our getting on without political combinations; they are our vital institutions, they abide in the innermost spirit of the people." . . . Subsequently from the same author: "With infinite pains, the men who framed our Constitution laid down ideas of individual freedom; they devised with great cunning a clever system of checks and balances in order that the government might do no harm; but they left to haphazard arrangements, or to voluntary associations unknown to the law and unknown to the theory of the state, the difficult task that was in itself the great problem of democracy. To these associations, which soon arose, was left the task of furnishing a medium for transmitting the will of the people to the government."

Bruce explains that one of the severe lessons to be learned in a democracy is that no automatic devices, least of all constitutions, charters, and laws, can permanently insure the efficiency and effectiveness of popular government. For these, many forces must be set in motion outside the constitutional framework to effect that vital connection between the people and their governing agencies. It is through political parties that not only public opinion is translated into action but that a continuous connection between the governing authorities and the members of the state is maintained. Parties have ever been outside the framework of government, yet they have constituted the blood and flesh and nervous system of it. Apart from a sound and active

public conscience, apart from the moral and political educa-
tion of the people, apart from the instruments of publicity
—press, radio, and platform—which combine to keep people
united and informed, one factor has been recognized from
the beginning as absolutely essential to efficient democracy:
it is the modern political party. McLaughlin, cited by
Bruce, defines the political party in a more realistic way as
a body of men, fluctuating in regards to its personnel and
its number, acquiring organization and developing *esprit
de corps* and a sense of self, that have started to work
together to accomplish a political end or to oppose other men
against whom for some reason they feel antagonism. A fact
of no little consequence, says Bruce, is that political parties
are voluntary associations. The definitions of political par-
ties that the courts have given in specific legal controversies
follow the political social concept already expressed of these
agencies of the people.[1]

Following a sound principle in conformance with the
concept of political parties as bodies which express the will
of the people, particularly in a political system such as the
present one in which according to the preamble of our Con-
stitution the source of public power resides in the will of the
people and guarantees the free participation of the citizen

---

[1] The courts have catalogued the political party as the *voluntary
association* of persons who believe in certain principles of government
for the purpose of promoting their political ideas by means of the
nomination of candidates to public office; of the control of governmental
structure; to put into effect its public policy ideas. They are not created
by the laws and they have absolute power over its internal affairs in
the absence of legislative regulation.

See: *Barceló* v. *Saldaña*, 42 P.R.R. 219, 246 (1931); *Kelso* v. *Cook*,
110 N.E. 987, 994–995 (1916); *Schafer* v. *Whipple*, 55 Pac. 180, 181–182
(1898); *Riter* v. *Douglas*, 109 Pac. 444, 450 (1910); *Morrow* v. *Wipf*,
115 N.W. 1121, 1127 (1908); *State* v. *Steward*, 210 Pac. 465, 468 (1922);
*Swindall* v. *State Election Board*, 32 P.2d 691, 695 (1934); *Robinson*
v. *Holman*, 26 S.W.2d 66, 67-68 (1930); *Yuratich* v. *Plaquemines Parish
Democratic Exec. Com.*, 32 So.2d 647, 652–653 (1947); *Chambers* v.
*I. Ben Greenman Ass'n*, 58 N.Y. Supp. 2d 637, 640 (1945); *State* v. *Cleve-
land Cliffs Iron Co.*, 157 N.E.2d 331, 333 (1959).

in the collective decisions, our Election Law does not create, organize or define political parties, nor does it determine or frame its internal organisms, nor how they should operate. It has used them as the appropriate instruments of the electoral procedure which leads to the election of such officers and agencies of the government as are to be constitutionally elected by the people's vote.

As such serviceable instrument in the electoral procedure, when the present petition for mandamus was filed the Christian Action Party was not a political party pursuant to the provisions of § 14 of the Election Law, since it was not a principal party because it had not participated in the 1956 elections, and consequently, it had not cast its vote for Governor, nor was it a party by petition because up to that moment it had not filed in the office of the Secretary of State for the 1960 elections, petitions in ¾ of the electoral precincts, nor a number equivalent to 10 per cent of all the votes cast for Governor in 1956. Therefore, its "Central Directing Body" was not the central directing body to which the provisions of the Election Law repeatedly makes reference and on which it confers certain attributions throughout the whole electoral proceeding. In that respect, the Secretary of State is correct. However, in the social-political concept which we mentioned at the beginning, it cannot be gainsaid that there existed a group or association of persons organized and directed by the plaintiffs to take part in the elections with a program or ideal of government acceptable to that group. In that sense, as a nucleus of expression of a part of the electorate, it became a political party with a directing body chosen by the members of the party which had not yet, but was about to enter, the mechanism of the law. In that same sense, the Election Law itself gave them certain recognition, through its § 37, which provided that the members of this group or nucleus of expression could state in each petition "the name of the *party*" which they

represented, and designate a simple "emblem" under which the name of *"such party's"* candidate shall be printed on the election ballots, thereafter prohibiting them as a *"political party"* which nominated candidates by petition, to use or adopt a name or emblem that had been previously used or adopted by any other political party. Such is the provision of law even at the stage of filing petitions in the required number of precincts with the required number of votes so that, having met such requirements, said group would become, together with the principal parties, another electoral instrument.

Upon a conflict arising between that group and the Secretary of State, which unquestionably affected or impaired its desire to become an electoral instrument within the Election Law because the Secretary of State was not willing to permit the filing of petitions for candidate nominations by recently registered voters, there is not the slightest doubt that the plaintiffs as members, organizers, participants, directors, and express principals of said association, had sufficient interest in the controversy and were actually interested parties in obtaining a judicial decree in their favor, even though it was not a question of rejecting their own petitions.

Even assuming that the plaintiffs should not qualify within the procedural technicism of Rule 15.1, they could be plaintiffs under the well-settled doctrine of the virtual or implied representation precisely prevailing in those cases of substantial groups or associations which by themselves do not have standing to sue or be sued, the parties being numerous, where any member of the group may file the action in pursuit of an interest or purpose common to all, it being superfluous for each one to sue individually.[2]

---

[2] See: Clark on *Codes Pleading* 201–205; *Smith et al.* v. *Swormstedt et al.,* 57 U.S. (16 Howard) 307, 322 (1853); *Carpenters' Union* v. *Citizens' Committee,* 164 N.E. 393, 403 (1928); *Meier* v. *Johnston,* 149 So. 185 (1933); *Hasinger et al.* v. *New York Central Mut. Fire Ins. Co.,*

■ Grounds (*b*) and (*c*) to dismiss the petition to the effect that it was academic or premature does not warrant further consideration. The Secretary contends that the voters had until August 28 to file petitions pursuant to § 37 and he had until September 15 to certify the names of the candidates filed in his office, pursuant to § 41, and that, therefore, he had no obligation at law to reject officially any petition prior to those dates. Apart from the fact that a rejection after the term to file petitions had expired would have deprived the petitioners from filing others in substitution, the Secretary accepted in his answer that he had stated to the plaintiffs that he was not willing to accept petitions signed by voters recently registered. There was a real and actual controversy which was neither academic nor premature.

■ We shall now turn to the merits of the case. Section 37 of the Election Law provides that "Each and every person who signs a petition for the nomination of a candidate for an office shall state that he is a duly registered voter of Puerto Rico and that he is qualified to vote for the candidate or candidates named in the said petition, and the name, age, color, precinct, and barrio under and in which his registration as a voter appears. . . ." The law does not contain any definition of the concept of the qualification to vote, for which reason we must search for it throughout its different provisions.[3]

---

178 Atl. 153, 154 (1935); *Davis et al.* v. *Hudgins*, 225 S.W. 73, 76 (1920); *Presbyterian Church et al.* v. *Johnson*, 238 N.W. 456, 457 (1931); *Aalco Laundry Co. et al.* v. *Laundry Lining etc.*, 115 S.W.2d 89, 90 (1938); *Quinn* v. *Buchanan*, 298 S.W.2d 413, 418 (1957).

[3] The Registration Act of 1939 uses the term "qualified voter" in its § § 6 and 14 upon referring to the constitution of the Registration Boards. The Organic Act of April 12, 1900 provided for the election of a House of Delegates by the "qualified voters" as thereinafter provided, and then it prescribed that all citizens of Puerto Rico shall be allowed to vote who have been bona fide residents for one year and who possess *qualifications of voters* under the laws and military orders in force on the 1st of March 1900, subject to such modifications as may be prescribed by the Executive Council. At that time the prevailing

Section 4 of the Law provides that every male citizen of the United States, *whose name appears in the registration list*, shall vote in the municipal district in which he resides.[4]

Section 34 of the first Election Law of March 8, 1906, which refers to the nomination of candidates by petition, provided that no petition shall be considered unless accompanied by a certificate of registration duly issued to petitioner. But in 1908 this section was amended by the Act of March 12 of that year, and it provided in a similar manner that the petitions should be signed by voters duly registered and qualified to vote for the candidates named in the petition.

Section 27 of the Law directs the General Supervisor of Elections to prepare provisional registration lists which are basically the lists of the voters in the preceding elections; lists of the voters registered in the election year, and reg-

statute was the Spanish Election Law of 1890, adapted to Cuba and Puerto Rico by the Royal Decree of November 25, 1897, which provided that all male Spaniards over 25 years of age who are in the full enjoyment of their civil rights and are residents of a municipality in which they have resided at least two years, were voters; and the General Order No. 160 of October 12, 1899, which provided that in order to vote in the municipal elections to be held thereafter, a voter must be a bona fide male resident of the municipality, over 21 years of age on election day, a taxpayer of record in the municipality in which he votes, and he must be able to read and write. Furthermore, he must have resided in Puerto Rico for the next preceding two years and for the last six months within the municipality. The Organic Act of 1917 provided for the election of the House and the Senate and of a Resident Commissioner by the "qualified electors" of Puerto Rico, and that at the first elections held the "qualified electors" shall be those having the qualifications of voters under the existing law, and thereafter they shall be citizens of the United States, over 21 years of age, and having such additional qualifications as may be prescribed by the Legislature of Puerto Rico. The Constitution provides that any person over 21 years of age and having the other qualifications provided by law shall be a voter.

[4] Section 15, as amended in 1947, provides that every citizen of the United States, whether man or woman, who is 21 years of age or over, on election day, who is not legally disqualified and who has resided for one year . . . . in the municipality where the election is held, shall vote in said municipality, *provided his or her name is registered on the election list.* . . .

istration transfer lists. The Election Law as well as the Registration Act contains proceedings and mechanisms which we need not now specify, so that those who had registered without meeting the legal requirements or whose registrations were declared void or defective without having been corrected, and those who having registered had died or were disqualified to vote, were excluded from the registration lists which constitute the basis of the right to vote. These processes of screening should terminate by July 31 of election year.

Section 19 of the Registration Act provides that with the exception of the applications for registration which were declared defective and which shall be corrected as provided therein, and with the exception of the applications for registration declared void by law, *all other applications for registration shall be considered valid for all election and legal purposes.* Section 12 of the Election Law contains a similar provision to the effect that except on order of a competent court, the Insular Board of Elections shall in no manner cancel, reject, invalidate or annul the legal registration of a voter, nor deprive a registered voter of his right to vote, and that said Board shall only cancel such applications for registration as are declared void under the Registration Act.

There is no provision whatsoever in the existing Election Law, nor in the Registration Act, nor has there been any in the previous electoral legislation which provides or indirectly implies that the voter duly registered who is qualified to vote for the candidate named in the petition to which § 37 of the the Law refers, is the registered voter who voted in the previous elections and not the registered voter who registered for the first time in the registration for the forthcoming elections. We find no reason whatsoever in the entire philosophy of the Election Law that requires us to impose, by construction, such a limitation to the signer of a petition to register a party; a limitation which the law

does not expressly provides. It is obvious that a petition made and signed by a voter who appears in the registration lists and is then excluded for any of the reasons provided by law, would lose its legal force and become ineffective.

■■ Finally, even though the situation might be doubtful insofar as either one of the interpretations might be proper, we would not be inclined to sanction the one that would tend to deprive the entire group of newly registered voters of part of the election franchise, in this case about 264,000 voters, that is, more than one fourth of the entire electoral mass in the voting lists. The enjoyment of the election franchise does not only constitute the right to cast the vote in the ballot box on election day for candidates and parties who appear in the tickets, but also the right of every citizen that the candidates of their choice be included in the electoral ballot. To deprive the newly registered voters of their right to submit petitions with candidates of their choice willing to establish government policies which they wish, would amount to compelling the entire new electorate to vote for candidates and government platforms of parties already existing, unless they resort to the free column in the ballot, without having an opportunity to create any new party. Such a construction on our part would not meet the public policy of the Election Law underlying a good democracy.

For the reasons stated we rendered judgment on August 4, 1960, denying the motions to dismiss filed herein and granting the petition for mandamus.

Mr. Chief Justice Negrón Fernández shall state separately the grounds of his dissent.

Messrs. Justices Blanco Lugo, Rigau, and Dávila, who were not part of the Court when the petition was decided, did not participate in this opinion.